UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ACTELION PHARMACEUTICALS US, INC., et al.,<br><br>Defendants. | Case No. 22-cv-07604-JSC<br><br>**ORDER RE: MOTION TO DISMISS**<br><br>Re: Dkt. No. 43 |

This lawsuit concerns an alleged scheme to raise prices for defendant Actelion Pharmaceuticals' pulmonary hypertension drugs. Plaintiffs are a series of entities (collectively, "MSP entities"). Plaintiffs buy "claims" from insurers that participate in the Medicare system and attempt to collect on those claims through various legal means. Here, Plaintiffs allege Defendants violated the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964, along with various state laws. Defendant Actelion moves to dismiss. After carefully reviewing the voluminous briefing in this matter and conducting oral argument on August 3, 2023, the Court GRANTS Actelion's motion to dismiss with leave to amend in part. Plaintiffs have not plausibly alleged their receipt of valid assignments of causes of action.

**AMENDED COMPLAINT ALLEGATIONS**

Defendant Actelion is a pharmaceutical company. (Dkt. No. 38 ¶ 46.) Actelion manufacturers and markets drugs used to treat hypertension, such as Tracleer, Opsumit, Veletri, and Ventavis. (*Id.* ¶¶ 1, 46.) Plaintiffs describe themselves as "companies that assist Government Healthcare Plans in detecting claims payments that are subject to reimbursement[.]" (*Id.* ¶ 29.)

Medicare is a government health-insurance program that primarily covers people aged 65 and over and others with certain disabilities or illnesses. Medicare consists of five parts: A (hospital insurance), B (medical insurance), C (a combination of part A and B coverage that is

provided by private insurance companies—referred to as "Medicare Advantage"), D (prescription drug coverage), and E (miscellaneous provisions). (*Id.* ¶ 75). Like Part C, Medicare Part D is based on a private-market model, in which Medicare contracts with private entities, known as Part D "sponsors." (*Id.* ¶ 77.)

Sponsors administer prescription drug plans. Plan sponsors must provide qualified prescription drug coverage. (*Id.*) A Part D sponsor submits a "bid" to the Centers for Medicare and Medicaid Services ("CMS") the year before it is to deliver Part D benefits. (*Id.* ¶ 78.) The bid contains a per member, per month cost estimate for providing Part D benefits to an average Medicare beneficiary in the geographic area. (*Id.*) CMS then provides each Part D plan sponsor with advance monthly payments equal to the Part D plan sponsor's standardized bid. (*Id.* ¶ 79.) After the close of each plan year, CMS determines "whether sponsors have been overpaid or whether Medicare owes them money" through a process called "reconciliation." (Dkt. No. 45-16 at 51; *see also United States ex rel. Baer v. Ludden*, No. 13-CV-223-JDP, 2016 WL 1259432, at *1 (W.D. Wis. Mar. 30, 2016) (taking judicial notice of the congressional research reports concerning how Medicare operates when, as here, both parties cited the same reports)).

Medicare limits plan sponsors' potential losses, or gains, by financing some higher-than-expected costs or recouping some excessive profits, relative to the amount the plan originally bid to offer Part D. (Dkt. No. 45-16 at 51-52.) For example, a plan that had higher-than-expected costs in 2021 was required to cover all benefit spending up to 105% of its standardized bid. (*Id.*) A plan with costs above 105% and up to 110% of its bid covered 50% of the costs within that range, and CMS paid the other 50%. (*Id.*) The same applies for the savings. A plan with costs amounting to 95% of its bid could keep all of the savings. (*Id.*) And so on.

**Patient Assistance Programs**

To buy prescription drugs, Part D plans generally require patients pay an out-of-pocket price, commonly known as "co-pay." (Dkt. No. 38 ¶ 18.) Once the co-payment is made, pharmacies bill the sponsor (the "third party payor") for the full drug cost. (*Id.* ¶ 5.) However, because many patients cannot afford co-pays, "patient assistance programs" help financially needy patients afford drugs. (*Id.* ¶ 87.)

These arrangements are susceptible to abuse. In short, a pharmaceutical company could manipulate the market for its own drugs by paying the co-payments for patients (through an intermediary patient assistance program), only to then reap the larger financial reward (the full sale price). By one estimate, for every $100 million given to a patient assistance program, pharmaceutical manufacturers yield $1 billion in increased sales. (*Id.* ¶ 74.) The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, prohibits pharmaceutical companies from paying remuneration to induce Medicare beneficiaries to purchase, or their physicians to prescribe, drugs that are reimbursed by Medicare.

Defendant Caring Voice Coalition, ("Caring Voice"), was a patient assistance program. The Department of Health and Human Services' Office of the Inspector General issued an advisory letter to patient assistance programs like Caring Voice, setting forth certain requirements to avoid Anti-Kickback Statute liability. (*Id.* ¶ 106.) In 2006 and 2014, Caring Voice certified it would comply with those regulations. (Dkt. No. 38-28; Dkt. No. 38-29.) Based on those representations, the HHS Inspector General issued an advisory opinion to Caring Voice "certifying" its patient assistance program. (*Id.*)

**The DOJ Settlement**

Between 2006 and 2017, Actelion gave Caring Voice $270 million. (Dkt. No. 38 ¶ 165.) Caring Voice, in turn, helped patients afford co-pays for drugs—including Actelion's drugs. (*Id.* ¶ 149.) After an investigation, the United States Department of Justice alleged Actelion engaged an illegal kickback scheme through its relationship with Caring Voice and certain pharmacies. (*See* Dkt. No. 38-2.) The Department of Justice contended:

> Actelion made donations to [Caring Voice's Pulmonary Arterial Hypertension] fund and used it as a conduit to pay the copay obligations of thousands of Medicare patients taking the Subject Drugs and to induce those patients' purchases of the Subject Drugs, because it knew that the prices Actelion set for the Subject Drugs otherwise could pose a barrier to those purchases. From January 1, 2014, through August 2015, Actelion routinely obtained data from [Caring Voice] detailing how many patients on each Subject Drug [Caring Voice] had assisted, how much [Caring Voice] had spent on those patients, and how much [Caring Voice] expected to spend on those patients in the future. Actelion received this information through funding requests, telephone calls, and written reports.

3

> Actelion used this information to budget for future payments to [Caring Voice] on a drug-specific basis and to confirm that its contribution amounts to [Caring Voice] were sufficient to cover the copays of patients taking the Subject Drugs, but not of patients taking other manufacturers' [Pulmonary Arterial Hypertension] drugs. Actelion engaged in this practice even though [Caring Voice] warned the company against receiving data concerning [Caring Voice's] expenditures on copays for the Subject Drugs.

(*Id.* at 2 ¶ E.) During that same period, according to the government, Actelion did not permit Medicare patients to participate in its free drug program—which was open to other financially needy patients. (*Id.*) Rather, Actelion directly referred Medicare patients to Caring Voices. (*Id.*) The government's allegations covered conduct that ended "prior to the acquisition of Actelion by Johnson & Johnson on June 16, 2017." (*Id.*)

Actelion and the United States settled in December 2018. Actelion paid the United States over $360 million. (*Id.* ¶ 1.)

**Plaintiffs' Assignments**

Plaintiffs "obtain[] assignments from their Assignors to recover reimbursement or payment from Defendants for the claims paid as a result of Defendants' fraud, waste, and abuse." (Dkt. No. 38 ¶ 29.) The "Assignors" here are health insurers, pursuant to Medicare Part C and Part D, which made payments "on behalf of, or otherwise became financially responsible for the cost of illegally inflated,[Anti-Kickback Statute]-tainted, and excessively dispensed Actelion Drugs as a result of the Scheme." (*Id.*)

Plaintiffs' amended complaint attaches five "representative" assignment agreements. (Dkt. No. 38-47.) The named assigning organizations are: Centro de Pediatria y Medicina de Familia de Villalba, C.S.P., Health First Administrative Plans, IMC, Sal Health Group, LLC, d/b/a Salubris, and SummaCare. (*Id.*) The agreements include broad, general language assigning "all" claims to various MSP entities. (*See* Dkt. No. 38-47.)

The assignment agreements include various chains that start with the assigning organizations and end with various MSP entities. (*Id.*) The assignment chains go as follows:

- **Centro de Pediatria** assigned claims to "Series 21-04-1561, a designated series of MSP Recovery Claims PROV Series LLC," (*Id.* at 1-9.)

- **Health First Administrative Plans** assigned claims to "MSP Recovery, LLC," which

4

assigned those claims to "Series 16-05-456," which in turn assigned the claims to "Series 44-20-456, a designated series of MSP Recovery Claims Series 44," (*Id.* at 10-29.)

- **IMC** assigned claims to "MSP Recovery, LLC" which further assigned "IMC, LLC" claims to "MSPA Claims 1, LLC," (*Id.* at 33-45, 47-50.)
- **Salubris** assigned claims to "Series 19-10-1128, a designated series of MSP Recovery Claims, CAID Series, LLC," (*Id.* at 52-62.)
- **SummaCare** assigned claims to "MSP Recovery LLC" to "Series 16-11-509 LLC, a series of MSP Recovery Claims Series LLC" (*Id.* at 63-81.)

Of the eventual recipients at the end of these assignment chains, only MSPA Claims 1 (which received claims from IMC) is a named plaintiff in this action. The "Series" entities are *not* plaintiffs here. But they assert they are, in turn, "series" of other LLCs that are plaintiffs here—like MSP Recovery Claims Series 44, MSP Recovery Claims PROV, MSP Recovery Claims Series LLC, and of MSP Recovery Claims, CAID Series. Plaintiffs provide an operating document for MSP Recovery Claims Series 44 and Series 44-20-456. (Dkt. No. 38-47 at 23-25.) That document indicates the "Company," Plaintiff MSP Recovery Claims Series 44, can sue on behalf of the "Series," Series 44-20-456. (*Id.* at 24 ¶ 2.) Except for MSPA Claims 1, Plaintiffs allege each plaintiff has an operating agreement that allows the establishment of designated series and allows the company to sue on behalf of that series. (Dkt. No. 38 ¶¶ 32, 37, 40, 43.) MSPA Claims 1 purportedly owns the assigned claims and is not suing on behalf of a series entity.

**Plaintiffs' Allegations**

Plaintiffs allege Defendants executed a co-payment circumvention scheme to reduce price sensitivity, fix supra competitive prices, and induce more dispensing of Actelion's drugs. (Dkt. No. 38 ¶¶ 2-3.) According to Plaintiffs, Actelion gave money to Caring Voice which, in turn, funneled money to "specialty pharmacies." (*Id.* ¶ 5, 212.) Actelion received information from Caring Voice regarding how many patients Caring Voice assisted in buying Actelion's drugs. (*Id.*) And, based on that data, Actelion decided how much to give in "donations" to Caring Voice. (*Id.*) The assignors—who manage Medicare Advantage and Medicaid Plans—bore the cost of the drugs that were marketed as "free" to patients and consumers. (*Id.* ¶ 211.)

5

1    Plaintiffs claim their "assignors" paid $42 million in claims between 2006 and the present
2    for Actelion drugs. (*Id.* ¶ 65.) They allege their assignors would not have paid for the drugs had
3    they known of the kickback scheme, because the kickback scheme violated Medicare regulations.
4    (*Id.* ¶ 243.) These transactions, they state, occurred in 21 states and territories. (*Id.* ¶ 66.)
5    Plaintiffs do not claim that amount is limited to just the five assignors named in attachments to the
6    FAC. But Plaintiffs allege some portion of that $42 million represents prescription
7    reimbursements for which Caring Voice paid the corresponding co-pay. (*See* Dkt. No. 38-40.)

     Based on Caring Voice's documents, Plaintiffs also attach a spreadsheet identifying
     "dozens of Enrollees that 1) received prescriptions and dispensed drugs because of the Co-
     Payment Circumvention Scheme; and 2) involved claims tied to direct payments from Plaintiffs'
     Assignors (and Class Members) to Defendants and the conspiring Specialty Pharmacies." (Dkt.
     No. 38 ¶ 68; Dkt. No. 38-40.) The spreadsheet contains data similar to the rows in the following
     table:

| msp_mrd_id | msp_client | msp_member_id_updated | DOS | msp_drug_name |
|---|---|---|---|---|
| 19953314 | BCBSRI-BCBSRI | 3400173-BCBSRI-BCBSRI | 2016-02-29 | Tracleer |
| 18249701 | BCBSRI-BCBSRI | 3400173-BCBSRI-BCBSRI | 2013-10-01 | Tracleer |
| 27934701 | BCBSRI-BCBSRI | 3400173-BCBSRI-BCBSRI | 2016-07-06 | Tracleer |
| 21784249 | BCBSRI-BCBSRI | 3400173-BCBSRI-BCBSRI | 2015-03-12 | Tracleer |
| 21282295 | BCBSRI-BCBSRI | 3400173-BCBSRI-BCBSRI | 2015-10-26 | Tracleer |

(Dkt. No. 38-40.) Plaintiffs explain:

> Many of the claims identified in Exhibit 39 relate to instances where the conspiring Specialty Pharmacies referred certain Enrollees to[Caring Voice], resulting in payments from Defendants to the Specialty Pharmacies, culminating in the use of mail and wire by the Specialty Pharmacies to submit claims and false certifications to Plaintiffs' Assignors and Class Members.

(Dkt. No. 38 ¶ 69.) Actelion, they allege, had "control" over the specialty pharmacies and Caring Voice, by providing funding, training, referrals, and advertising material. (*Id.* ¶ 71.)

     Plaintiffs filed this putative class-action on December 2, 2022. (Dkt. No. 1.) Against Actelion, Plaintiffs asserted federal RICO and RICO conspiracy claims; a Florida state RICO claim; claims under the consumer protection statutes of 11 states; California common law fraud, and unjust enrichment in 10 states. Actelion moves to dismiss. (Dkt. No. 43.)

6

# DISCUSSION

## I. Assignment Standing

Actelion challenges Plaintiffs' assignment-based standing on two grounds. First, Actelion argues some of Plaintiffs' claims are not assignable as a matter of law. Alternatively, Actelion argues that Plaintiffs fail to plausibly plead valid assignment-based standing here.

### A. Are Plaintiffs' Claims Assignable?

#### 1. RICO

The Racketeer Influenced and Corrupt Organizations Act ("RICO") includes a civil remedy provision that allows private parties to sue for injuries to their "business or property" caused "by reason of" a defendant's violation of RICO. That civil remedy provision states:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee…

18 U.S.C. § 1964(c). Actelion argues civil RICO claims are not assignable; in other words, only the person (or corporation) "injured in *his* business or property" can sue. Applied here, that would mean the ultimate assignors (the insurers) have RICO standing to sue. But downstream purchasers of those RICO claims cannot sue because Congress delineated a personal right, not an assignable one.

Every court considering the matter has held RICO claims assignable.[1] Generally, courts reason by analogy to federal antitrust law. *See Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112 (3d Cir. 1993) (assuming the assignment of RICO claims must be express since the assignment of federal antitrust claims must be express). The Sherman Act, 15 U.S.C. § 15, and the Civil RICO

---

[1] *See, e.g.*, *Fed. Ins. Co. v. Parello*, 767 F. Supp. 157, 163 (N.D. Ill. 1990) ("There is very little room to argue that Congress would intend to allow the assignment of antitrust claims and would prohibit the assignment of RICO claims."); *In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 636 F. Supp. 1138 (C.D. Cal. 1986) (because antitrust damages claims are assignable and the goals of the RICO and antitrust statutes are similar—deterring interference with free competition—RICO claims are similarly assignable); *Nicolls Pointing Coulson Ltd. v. Transp. Underwriters of La., Inc.*, 777 F. Supp. 493 (E.D. La. 1991) (RICO claims assignable); *Resolution Trust Corp. v. S & K Chevrolet*, 868 F. Supp. 1047, 1054 (C.D. Ill. 1994) ("RICO claims may be assigned"); *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 400 n.2 (S.D.N.Y. 2013) ("RICO claims are assignable.").

7

provisions in 18 U.S.C. § 1964(c) contain the same language. Because courts universally allow assignment of antitrust claims, RICO claims are viewed as assignable as well. *See also In re National Mortgage Equity Corp. Mortgage Pool Certificates Securities Litigation,* 636 F. Supp. 1138, 1155–56 (C.D.Cal.1986) (finding, in a commonly cited opinion, RICO claims assignable based on RICO's "remedial," as opposed to punitive, aims).

The Ninth Circuit has not spoken directly on the issue. Actelion argues *Silvers v. Sony Pictures Entertainment., Inc.*, 402 F.3d 881, 883 (9th Cir. 2005) (en banc), compels the conclusion RICO claims are not assignable. In *Silvers*, the owner of a television movie script assigned to the scriptwriter (who had no ownership in the script because it was a work-for-hire) "all right, title and interest in and to any claims and causes of action" against certain entities that had allegedly infringed the television script copyright; that is, it assigned the bear right to sue. The scriptwriter then sued Sony for copyright infringement of the script. Sony moved to dismiss on the grounds the scriptwriter did not have standing to sue since she did not own the copyright. After the district court denied the motion, the Ninth Circuit heard the issue on interlocutory appeal.

The en banc court began its analysis with an analysis of the copyright statute: "Copyright . . . is a creature of statute, and the only rights that exist under copyright law are those granted by statute." *Id.* at 883-84. It explained the statute "establishes who is legally authorized to sue for infringement of a copyright: The *legal or beneficial owner of an exclusive right under a copyright*." *Id.* at 884. Thus, reasoned the court, the statute's meaning is clear: "To be entitled to sue for copyright infringement, the plaintiff must be the 'legal or beneficial owner of an exclusive right under a copyright.'" *Id.* Because the plaintiff was not the owner of an exclusive right under the script's copyright—and merely purchased a bare right to sue—the statute did not give the plaintiff standing to sue. *Id.* at 885.

The court recognized the statute does not say "that *only* a legal or beneficial owner of an exclusive right is entitled to sue." *Id.* It nonetheless reasoned:

> under traditional principles of statutory interpretation, Congress' explicit listing of who *may* sue for copyright infringement should be understood as an *exclusion of others* from suing for infringement. The doctrine of *expressio unius est exclusio alterius* "as applied to statutory interpretation creates a presumption that when a statute

8

> designates certain persons, things, or manners of operation, all omissions should be understood as exclusions."

*Id.* The court concluded "[t]here are two particularly important reasons to apply such a presumption" to the Copyright Act. First: "Copyright is a creature of statute, so we will not lightly insert common law principles that Congress has left out." Second, the provision providing the right to sue also limited the cause of action to the person who owned the copyright when the infringement occurred. *Id.*

Actelion argues the same principle applies to the RICO statute. It is a creature of statute, and so the standing question should begin with the statute's language. The statute gives a private-right-of-action to specific persons: those "injured in [their] business or property by reason of a statutory violation." 18 U.S.C. § 1964(c). Because Plaintiffs do not own the business or property injured by Actelion's conduct, Actelion reasons Plaintiffs do not have standing to bring RICO claims notwithstanding the alleged assignment of the bare right to bring suit.

The argument has some force, but, as the Court observed at oral argument, the parties' briefs on the issue do not meet. Actelion does not address the cases holding RICO assignable and Plaintiffs do not address *Silvers*. To adequately analyze this question further briefing is required. Because, as discussed below, there are other issues with Plaintiffs' standing, the Court need not resolve the question at this time. But if a new motion to dismiss is filed, the parties should more thoroughly address the assignability of RICO claims.

### 2. The Consumer Protection Claims

Defendants move to dismiss the consumer protection claims on similar grounds. For example, Plaintiffs bring a claim under California's Unfair Competition Law ("UCL"). Cal. Bus. Code §§ 17000, et seq. But California UCL claims are not assignable. *Amalg. Transit Union, Local 1756, AFL-CIO v. Superior Ct.*, 46 Cal. 4th 993, 1000-02 (2009). Defendants do not cite specific cases for every state law Plaintiffs invoke. Instead, they argue a presumption against assignability should apply to the remaining state consumer protection claims.

As an initial matter, Plaintiffs make no effort to defend the assignability of their consumer protection claims based on California's UCL. Nor do Plaintiffs defend the claims under Puerto Rico or Rhode Island's statutes. As Plaintiffs hold the burden to show valid assignment-based

9

standing, those claims are dismissed. That leaves consumer protection claims under Connecticut, Florida, Illinois, Massachusetts, Michigan, New York, Ohio, and Wisconsin law.

Plaintiffs' attempts to show assignability for these laws are suspect. For example, Plaintiffs cite the Connecticut Supreme Court, in *Stearns & Wheeler, LLC v. Kowalsky Bros., Inc.*, 955 A.2d 538 (Conn. 2008) for the proposition that Connecticut Unfair Trade Practices Act claims are assignable. (*See* Dkt. No. 51 at 28 n.20.) But *Stearns & Wheeler* did not reach the issue of assignability. *Stearns & Wheeler,* 955 A.2d 543 at n.12. Indeed, the Connecticut Supreme Court noted its concern regarding "the temptation for unscrupulous interlopers and litigious persons" and "policies against trafficking in personal claims and excessive litigation." *Id.* (cleaned up). Applied here, the Court would assume such claims are not assignable. But chasing down Plaintiffs' remaining citations to see if they are more persuasive than *Stearns & Wheeler* is unnecessary.

Even assuming Plaintiffs could show assignability, the Court declines to wade further into complex issues of state law at this stage as Plaintiffs do not allege facts that plausibly suggest any of these states' laws apply. Taking Plaintiffs' allegations under Connecticut law as an example, Plaintiffs plead:

> 364. Defendants' conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4) ("Connecticut UTPA").
>
> 365. The Connecticut UTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).
>
> 366. Defendants' conduct constitutes "unfair or deceptive" acts in violation of the Connecticut UTPA.
>
> 367. Defendants' illegal conduct substantially affected Connecticut commerce and consumers.
>
> 368. Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the Actelion Drugs herein.
>
> 369. Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Connecticut.

> 370. Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Actelion Drugs in the State of Connecticut.
>
> 371. Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Attorney General and Commissioner of Consumer Protection pursuant to Conn. Gen. Stat. § 42-110g.
>
> 372. Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

(Dkt. No. 38 ¶¶ 364-372.) And so on, for each additional state law claim.

A "formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). The allegation, for example, that "Defendants illegal conduct substantially affected Connecticut commerce and consumers" is a conclusion, not a fact. What good-faith basis is that statement based on? The claims data provided in the complaint do not list sales by state. Plaintiffs' other state law claims fair no better. Each is merely a recitation of the elements of the cause of action.

So, assuming (without deciding) each state law invoked allows assignment of claims, the consumer protection claims are dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *See MSP Recovery Claims, Series LLC v. Abbott Laboratories*, No. CV-19-21607-FLW-ZNQ, 2021 WL 2177548, at *10 (D.N.J. May 28, 2021) (deferring ruling on assignability given "cursory" briefing from defendants). Should Plaintiffs allege these claims in an amended complaint, the Court will revisit the assignability issue for states other than California.

### B. Do Plaintiffs Adequately Plead Assignment Standing?

Assuming, without holding, Plaintiffs plead at least some assignable claims, the next question is whether Plaintiffs adequately plead assignment here. Because "standing is an essential and unchanging part of the case-or-controversy requirement of Article III," federal courts cannot exercise jurisdiction over parties that lack standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The party invoking federal jurisdiction bears the burden of establishing" standing at each stage in legal proceedings. *Id.* at 561. This requires a plaintiff show, among other things, that it "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (cleaned

11

up).

In general, "the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286 (2008) (citation omitted). But the Court must guard the standing requirement carefully in the assignment context. *In re Brooms,* 447 B.R. 258, 265 (9th Cir. 2011) ("In an action involving an assignment, a court must ensure that the plaintiff-assignee is the real party in interest with regard to the particular claim involved by determining: (1) what has been assigned; and (2) whether a valid assignment has been made.").

Applying these principles, Plaintiffs must plead facts that—when taken as true—support a plausible inference (1) the ultimate assignors suffered an injury-in-fact, and (2) the assignors' claim arising from that injury was validly assigned to Plaintiffs. *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1317-18 (11th Cir. 2019) (citing *Sprint*, 554 U.S. at 289).

### 1. Unpled Assignors

Plaintiffs lack standing to bring claims on behalf of unpled "assignors" based on "representative" assignments. "Standing 'is not dispensed in gross'; instead, 'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" *MAO-MSO Recovery II, LLC v. Mercury Gen.*, No. 21-56395, 2023 WL 1793469, at *2 (9th Cir. Feb. 7, 2023) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). Here, Plaintiffs seek standing in gross for unnamed assignors. That is insufficient. If Plaintiffs seek to pursue claims based on valid assignments, Plaintiffs must plead which assignors' claims they seek to vindicate. *In re Brooms,* 447 B.R. 258, 265 (9th Cir. 2011).

An assignee "stand[s] in the shoes" of the assignor. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 578 (7th Cir. 2019). To prove Plaintiffs are real parties in interest here, the Court needs to know which shoes Plaintiffs claim to occupy. *Id.* Thus, claims purporting to vindicate unnamed "assignors'" rights lack standing here. *See Brown v. Bank of Am., N.A.*, 660 F. App'x 506, 509 (9th Cir. 2016) (affirming dismissal of complaint when plaintiff pled he was "the assignee of the claims" listed in an exhibit but did not provide assignment agreements). At a minimum, Plaintiffs must plead some specific facts alleging a specific named

12

assignor assigned its claims to Plaintiffs via a valid assignment agreement.

### 2. The "Representative" Assignors

Though Plaintiffs do not include allegations regarding any specific assignor in the complaint, Plaintiff do attach five "representative" assignment agreements. (Dkt. No. 38-47.) Plaintiffs also provide "claims data" to support the assertion all "assignors" suffered injuries. (*See* Dkt. No. 38-40.)

But Plaintiffs' data largely undermines Plaintiffs' claims. *See ALD Soc., LLC v. Verkada, Inc.*, No. 23-CV-00049-JSC, 2023 WL 1802418, at *5 (N.D. Cal. Feb. 7, 2023) (finding, in the patent context, the "[p]laintiff 'pleaded itself out of court' with its detailed claim charts.") (citations omitted). The problem is that the "representative" assignors do not appear on the spreadsheet Plaintiffs provide, at least as far as the Court can tell. (*Id.*) That the named assignors do not appear in the "representative" claim data and are not named specifically in the complaint can only support an inference those assignors did not suffer any actual injury. *MSP Recovery Claims, Series LLC v. Pfizer, Inc.*, No. 22-CV-01419 (DLF), 2023 WL 2770432, at *5 (D.D.C. Apr. 4, 2023) (finding "the Court cannot accept inferences that are unsupported by the facts set out in the complaint") (cleaned up)); *MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1307 (11th Cir. 2022) (Jordan, J., concurring) ("How [a claim entry in a spreadsheet] provided fair notice to [defendant] is beyond me."); *MSP Recovery v. Metro. Gen. Ins. Co.*, 2023 WL 168758, *2 (S.D. Fla. Jan. 12, 2023) (Plaintiffs' "unhelpful[]" claims data tables "fail[ed] to clearly set forth any injuries").[2] To hold otherwise would be granting Plaintiff an unwarranted inference and would constitute dispensing standing "in gross." *Mercury Gen.*, 2023 WL 1793469, at *2.

In general, pleading injury for standing purposes is not a high bar. *See Vargas v.*

---

[2] *See also MSP Recovery Claims, Series LLC v. Endurance Am. Ins. Co.*, No. 20-23219, 2021 WL 706225, at *3 (S.D. Fla. Feb. 23, 2021) (no standing because plaintiff "provided no *factual* assertions . . . to show that A.A.'s claim was part of the assignment between Avmed, Inc. and the Plaintiff"); *MSP Recovery Claims, Series LLC v. Merchants Mut. Ins. Co.*, No. 19-cv-524, 2020 WL 8675835, at *10, *12 (W.D.N.Y. Nov. 20, 2020), report and recommendation adopted by 2021 WL 784537 (Mar. 1, 2021) (no standing because none of plaintiff's factual allegations permitted the court to "determine whether plaintiffs' claims related to the exemplar beneficiaries fall within the assigned claims").

13

1   *Facebook, Inc.*, No. 21-16499, 2023 WL 4145434, at *1 (9th Cir. June 23, 2023). "General

2   *factual* allegations . . . may suffice." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)

3   (emphasis added). But the allegations must be *factual,* and they must at least provide enough

4   substance to link a *specific* plaintiff's claim to a *generally* described injury. *See Vargas*, 2023 WL

5   4145434, at *1 ("Plaintiff Vargas provides an example.") This is particularly true when a plaintiff

6   purports to vindicate an assigned claim. *In re Brooms,* 447 B.R. 258, 265 (9th Cir. 2011). The

7   plaintiff must allege *facts*, for each specific assignor it invokes: a specific valid assignment and a

8   specific injury the assignor suffered. *Tenet Fla., Inc.*, 918 F.3d at 1318. Scattershot, non-specific

9   pleading falls short of Plaintiffs' burden to prove "the ultimate assignor[s] . . . suffered an injury-

10  in-fact." *Id.*

                                                 * * *

12  The faults identified above could be remedied in an amended complaint. For example,

13  Plaintiffs provide no facts explaining the claims data attached to the complaint. (Dkt. No. 38-40.)

14  An amended complaint could ameliorate the injury concerns expressed here and Actelion's

15  reasonable notice concerns under Rule 8(a). So, leave to amend is warranted.

16              **3.      Actelion's Other Arguments**

17  Actelion makes several additional, brief arguments against the assignments. The Court

18  addresses each in turn.

19                       **a.      Clarity of Agreements**

20  Actelion challenges the IMC assignment on grounds that it is not clear "IMC" is, in fact,

21  IMC, LLC. IMC assigned claims to "MSP Recovery, LLC" which further assigned "IMC, LLC"

22  claims to "MSPA Claims 1, LLC," (Dkt. No. 38-47 at 33-45, 47-50.) This Court shares concerns

23  expressed by other courts regarding the "IMC" assignments. *MSPA Claims I, LLC v. Infinity*

24  *Prop. & Cas. Grp.*, 374 F. Supp. 3d 1154, 1163-64 (N.D. Ala. 2019). However, because IMC has

25  not appeared in the claims data and so does not appear to have suffered any specific injury alleged

26  in the complaint, the Court need go no further.

27  Actelion also challenges the assignments to Health First. Actelion notes Health First

28  Administrative Plans is referred to as Health First Administrative Plans in some documents and

14

1   Health First Health Plans in other documents.  Plaintiffs do not explain the relationship between
2   these entities in the complaint.  Regarding these same "Health First" entities, the Seventh Circuit
3   has explained, "it suffices to say that this corporate arrangement was not just complex, but so
4   freighted with overlapping names and functions that a mix-up was, at the end of the day,
5   understandable." *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573,
6   585 (7th Cir. 2019).  Thus, again, the Court shares the concerns espoused in the Seventh Circuit's
7   decision.  Plaintiffs could surely better explain their documents and provide specific assignment
8   chains in the text of the complaint.

### b. Scope

Although the Ninth Circuit does not require "terms of art . . . for a valid assignment," *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 748 (9th Cir. 1993), the assignee must provide proof an assignment occurred. "[G]eneral contract principles dictate that to prove an effective assignment, the assignee must come forth with evidence that the assignor meant to assign rights and obligations under the contracts." *Britton v. Co–op Banking Grp.*, 4 F.3d 742, 746 (9th Cir. 1993) (citing Restatement (Second) of Contracts § 317(1), 324 (1981)).  Actelion makes a series of arguments regarding what exactly was assigned here.

First, Actelion cites *Brown v. Bank of Am., N.A.*, No. ED CV 12-02009 TJH, 2014 WL 12707378, at *1 (C.D. Cal. Feb. 24, 2014), *aff'd*, 660 F. App'x 506 (9th Cir. 2016), for the proposition RICO assignments must be "express."  According to Actelion, that means the assignment must contain the word RICO.  Not so.  The claims in *Brown* failed because the plaintiff did not allege any fact or provide any exhibits regarding his claim to be an assignee, *id.*, not because he failed to use a "term of art."  *Kelly v. Boeing Co.*, 9 F.3d at 748.  By way of example, *Brown* relied on *Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106 (3d Cir. 1993).  There, then-Judge Alito looked to antitrust precedent and found assigning "all . . . causes of action … [and] claims and demands of whatsoever nature" constituted an "express" assignment of RICO claims.  *Id.* at 112.  The assignment here included "all Claims . . . whether based in contract, tort, statutory right. . . ." (Dkt. No. 38-47 at 13.)  That language meets the express assignment requirement as described in *Lerman*.

15

Second, Actelion objects Plaintiffs redact entire pages within the assignment agreements. The Court too has concerns regarding the extensive redactions. (*See id.* at 12-13.) However, at this stage, the visible terms support an inference an assignment exists.

Third, Actelion notes Health First Administrative Plans did not assign all claims to MSP entities. Rather, it excluded claims other parties had already pursued. (*Id.* at 13.) Health First Administrative Plans was required under the agreement to list those claims to MSP. (*Id.*) To show valid assignment, Actelion argues Plaintiffs must plead that the claims alleged here are *not* those claims carved out from the assignment agreement. Plaintiffs plead "each and every cause of action identified in this Complaint was expressly assigned to Series 44." (Dkt. No, 38 ¶ 38.) At this stage, that allegation supports an inference the previously assigned claims (which were not assigned to MSP entities) are not a part of this case. Any double-recovery argument is better made at summary judgment.[3]

### c. Assignment Chains

Finally, Actelion argues the assignment chains identified above end with entities that are not plaintiffs in this case. *See MAO-MSO Recovery II, LLC v. Mercury Gen.*, No. 21-56395, 2023 WL 1793469, at *2 n.2 (9th Cir. Feb. 7, 2023). But Plaintiffs plausibly plead claims were ultimately assigned to "Series 44-20-456, a designated series of MSP Recovery Claims Series 44." (Dkt. No. 38-47 at 10-29.) MSP Recovery Claims Series 44 is a plaintiff here. Plaintiffs provide an operating document for MSP Recovery Claims Series 44 and Series 44-20-456. (Dkt. No. 38-47 at 23-25.) That document indicates the "Company," Plaintiff MSP Recovery Claims Series 44, can sue on behalf of the "Series," Series 44-20-456. (*Id.* at 24 ¶ 2.)[4]

\* \* \*

---

[3] Actelion also asks the Court to take judicial notice of news articles regarding MSP's sale of some of its claims to other parties. Actelion raises the concern that the claims asserted here may already have been sold. At this stage, the presumption of truthfulness still applies to Plaintiffs' complaint. Should later evidence reveal the claims asserted here are not in fact still assigned to MSP, Actelion can raise that issue in a motion for summary judgment.

[4] An amended complaint should either include the relevant operating agreements for other entities or join the proper assignees. *See MAO-MSO Recovery II, LLC v. Mercury Gen.*, No. 21-56395, 2023 WL 1793469, at *3 (9th Cir. Feb. 7, 2023) (Berzon, J., dissenting in part).

16

**CONCLUSION**

Actelion's motion to dismiss is GRANTED. The California UCL claim is dismissed without leave to amend as it is not assignable as a matter of established California law. The other claims are dismissed with leave to amend to correct the deficiencies identified above. Plaintiffs should also be mindful of the additional arguments Actelion made in support of the motion to dismiss which the Court did not need to reach to dispose of the motion. Any amended complaint must be filed by September 28, 2023.

Actelion's motion for leave to file a supplemental request for judicial notice is DENIED as moot.

This Order disposes of Docket Nos. 43 and 63.

**IT IS SO ORDERED.**

Dated: September 5, 2023

JACQUELINE SCOTT CORLEY
United States District Judge

17