1

2

3

4              UNITED STATES DISTRICT COURT

5            NORTHERN DISTRICT OF CALIFORNIA

6

7   MSP RECOVERY CLAIMS, SERIES LLC,        Case No. 3:22-cv-07604-JSC
    et al.,
8
            Plaintifs,                        **ORDER RE: DEFENDANTS'
9                                             MOTIONS TO DISMISS RICO
        v.                                    CLAIMS AND ESHC'S MOTION TO
10                                            DISMISS**
    ACTELION PHARMACEUTICALS US,
11  INC., et al.,                             Re: Dkt. Nos. 89, 91, 97, 108, 118

12          Defendants.

13         MSP Recovery Claims, Series LLC[1]; MSPA Claims 1, LLC; MSP Recovery Claims

14  PROV, Series LLC (together, referred to as "MSP"), bring a putative class action against Actelion

15  Pharmaceuticals US, Inc. ("Actelion"), Caring Voice Coalition, Inc. ("CVC") and Adira

16  Foundation f/k/a Facilitating Patient Health ("Adira"), Express Scripts, Inc., Express Scripts

17  Holding Company ("Express Scripts Holding"), and Accredo Health Group ("Accredo").

18  Plaintiffs allege Defendants conspired to increase the unit price and quantity dispensed of various

19  prescription drugs used to treat pulmonary arterial hypertension.  Pending before the Court are

20  Defendants' motions to dismiss (Dkt. Nos. 89, 91),[2] as well as various administrative motions

21  related to case filings.  (Dkt. Nos. 97, 108, 118.)  After considering the briefing, including

22  supplemental briefing, and with the benefit of oral argument on April 18, 2024, the Court

23  GRANTS Express Scripts Holding's motion to dismiss for lack of personal jurisdiction, GRANTS

24

_____

25  [1] MSP Recovery Claims, Series LLC "has established various designated series pursuant to
    Delaware law to maintain various claims recovery assignments separate from other Company
26  assets, and to account for and associate certain assets with certain particular series," but pursuant
    to the MSP Recovery Claims, Series LLC's "limited liability agreement, all designated series form
27  a part of [MSP Recovery Claims, Series LLC]."  (Dkt. No. 67 ¶ 35.)
    [2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
28  ECF-generated page numbers at the top of the documents.

MSP's motion to strike Actelion's appendix, GRANTS MSP's motion to file a surreply, GRANTS Actelion's motion for leave to file a supplemental authority, and GRANTS Defendants' motion to dismiss MSP's Racketeer Influenced and Corrupt Organizations Act ("RICO") claims.  The Court holds the bare assignment of RICO claims does not give Plaintiffs—strangers to the underlying controversy—statutory RICO standing.  The Court will decide the remaining issues in Defendants' motions to dismiss in a later order after further oral argument.

SECOND AMENDED COMPLAINT ALLEGATIONS

The facts relating to the underlying suit are recited in this Court's previous order (Dkt. No. 65), and the Court incorporates those facts by reference here.

EXPRESS SCRIPTS HOLDING'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

## I.   RELEVANT FACTUAL ALLEGATIONS

"Accredo Health Group . . . is a wholly owned subsidiary of Medco Health Solutions, Inc." (Dkt. No. 67 ¶ 48.)  Medco Health Solutions ("Medco") "was acquired by Express Scripts."[3]  (*Id.* ¶ 50.)  Medco and Express Scripts, Inc. "are "agents and/or alter ego [sic] of Express Scripts Holding Company."  (Dkt. No. 67 ¶ 51.)  "All of the officers of Medco Health Solutions, Inc. are also officers of Express Scripts, Inc," and many of them are also officers of Express Scripts Holding Company.  (*Id.*)

"Accredo is one of the largest specialty pharmacies" and operates in California.  (*Id.* ¶¶ 48-49.)  "[C]o-conspiring pharmacies, such as Accredo . . . generate and submit claims for payment to certain third-party payors, including Assignors."  (*Id.* ¶ 8.)  Plaintiffs' Assignors paid for relevant drugs that were dispensed by Accredo in Florida (*id.* ¶¶ 95, 147, 192, 237, 255, 260), Massachusetts (*id.* ¶ 119), Puerto Rico (*id.* ¶¶ 129, 182, 212), Wisconsin (*id.* ¶ 177), and Connecticut (*id.* ¶ 242).  Accredo "co-hosted and co-sponsored the first annual CVC Gala,

---

[3] The complaint uses the term "Express Scripts," and does not clarify whether this is in reference to Express Scripts, Inc. or Express Scripts Holding.  This ambiguity is made more confusing given the complaint uses the shortened term "Express Scripts" to refer to "Defendant Express Scripts Holdings [sic] Company" (Dkt. No. 67 ¶ 46), "Defendant Express Scripts Inc." (*id.* ¶ 47), and "Defendant Accredo Health Group, Inc." (*Id.* ¶ 48.)

United States District Court
Northern District of California

1  whereby they informed their select guests (presumably physicians and potential patients) of the

2  ability to obtain 'free' Actelion drugs through CVC."  (*Id.* ¶ 399.)

3  ## II.    DISCUSSION

4      Plaintiffs "bear[] the burden" of establishing personal jurisdiction exists.  *In re Boon*

5  *Global Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019).  The Court may consider declarations and other

6  evidence outside the pleadings to determine whether it has personal jurisdiction.  *Id.*

7  "[U]ncontroverted allegations in plaintiff[s'] complaint must be taken as true," but courts "may

8  not assume the truth of allegations in a pleading which are controverted by affidavit."  *Mavrix*

9  *Photo, Inc. v. Brand Techs., Inc*., 647 F.3d 1218, 1223 (9th Cir. 2011) (cleaned up).  Any "factual

10  disputes" must be "resolve[d] . . . in the plaintiff[s'] favor."  *Id.*

11      Courts recognize two forms of personal jurisdiction, general and specific.  *Bristol-Myers*

12  *Squibb Co. v. Super. Court of Cal., S.F. Cty.*, 582 U.S. 255, 262 (2017) (citing *Goodyear Dunlop*

13  *Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011)).  General jurisdiction over a

14  nonresident corporation "is appropriate only when the corporation's contacts with the forum state

15  are so constant and pervasive as to render it essentially at home in the state."  *Martinez v. Aero*

16  *Caribbean*, 764 F.3d 1062, 1066 (9th Cir. 2006) (cleaned up).  Specific jurisdiction requires a

17  nonresident defendant's "suit-related conduct [to] create a substantial connection with the forum

18  State."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

19      Plaintiffs allege Express Scripts Holding is "a corporation organized and existing under the

20  laws of the State of Delaware with its principal place of business" in Missouri.  (Dkt. No. 67 ¶ 46.)

21  So, Plaintiffs have not established general jurisdiction exists.  Plaintiffs also do not contend

22  general jurisdiction exists because of Express Script's Holding's subsidiaries.  (*See* Dkt. No. 98 at

23  28 (arguing only the Court has "specific personal jurisdiction" over Express Scripts Holding).)

24      Plaintiffs contend the Court has specific personal jurisdiction over Express Scripts Holding

25  because of contacts Express Scripts Holding's subsidiaries—Medco, Accedo, and Express Scripts,

26  Inc.—had with California.  Plaintiffs do not plead either Medco or Express Scripts, Inc. took any

27  specific actions in California. Nor do Plaintiffs plead any of Accredo's galas took place in

28  California or that any of Accredo's specific drug dispersals happened in California.  Instead, MSP

United States District Court
Northern District of California

1    allege in general terms "[t]he claims paid for by Assignors . . . involved transactions (and related

2    events)" in California, though MSP do not specifically allege those Assignors paid Accredo—

3    rather than a different pharmacy—for those California claims.  (*Id.* ¶72.)  MSP further assert

4    Accredo's "conduct as [a] member[] of the Co-Payment Circumvention Enterprise" constitutes

5    minimum contacts with California because "Defendant Specialty Pharmacies transact [sic] its

6    affairs in the State of California and engaged in substantial and not isolated activity throughout the

7    State of California," "Assignors and Class Members sustained financial and economic injuries in

8    the state of California," and "Defendant Specialty Pharmacies contracted with Actelion."  (*Id.* ¶

9    53.)  Plaintiffs define "Defendant Specialty Pharmacies" as "Accredo Therapeutics, CVS

10   Caremark, CuraScript, and TheraCom."  (*Id.* ¶ 8.)  In sum, Plaintiffs fail to plead any specific facts

11   alleging Medco, Accredo, or Express Scripts, Inc. have in sufficient contacts with California to

12   exercise personal jurisdiction.

13        Even assuming Plaintiffs had sufficiently pled Express Scripts Holding's subsidiaries had

14   sufficient contacts with California, "[t]he existence of a parent-subsidiary relationship is

15   insufficient, on its own, to justify imputing one entity's contacts with a forum state to another for

16   the purpose of establishing personal jurisdiction."  *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1070 (9th

17   Cir. 2015).  Only "in certain limited circumstances, the veil separating affiliated entities may be

18   pierced . . .  to exercise personal jurisdiction over a foreign defendant."  *Id.* at 1071.  One such

19   circumstance is when the parent corporation is an "alter ego" of its subsidiaries.  *Id.*  "The alter

20   ego test is designed to determine whether the parent and subsidiary are not really separate entities,

21   such that one entity's contacts with the forum state can be fairly attributed to the other."  *Id.*

22   (cleaned up).  "To satisfy this test, a plaintiff must make out a prima facie case (1) that there is

23   such unity of interest and ownership that the separate personalities of the two entities no longer

24   exist and (2) that failure to disregard their separate identities would result in fraud or injustice."

25   *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1021 (9th Cir. 2017) (quotation marks and

26   citations omitted).

27        Plaintiffs fail to plead sufficient facts to demonstrate Express Script Holding's

28   subsidiaries—Accredo, Express Scripts Inc., or MedCo Health Solutions—were the alter ego of

United States District Court
Northern District of California

4

Express Scripts Holding for purposes of personal jurisdiction.  First, they fail to plead a "unity of interest" between Express Scripts Holding and its subsidiaries sufficient to satisfy the alter ego test.  "When considering entities' unity of interest, relevant factors include 'the commingling of funds and other assets of the entities, the holding out by one entity that it is liable for the debts of the other, identical ownership of the entities, use of the same offices and employees, use of one as a mere shell or conduit for the affairs of the other, inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1004 (N.D. Cal. 2020) (quoting *MH Pillars Ltd. v. Realini*, No. 15-CV-1383-PJH, 2017 WL 916414, at *12 (N.D. Cal. Mar. 8, 2017)).  While Plaintiffs plead Express Scripts Holding is run by the same officers as Medco Health Solutions and Express Scripts, Inc. (Dkt. No. 67 ¶ 51), that alone is insufficient under the unity of interest test.  *Harris Rutsky & Co. Ins. Servs.*, 328 F.3d at 1135 (Even if the parent is "run by the same senior officers and directors" and "share[s] the same offices" as the subsidiary, "these facts do not necessarily render" the subsidiary "the alter ego" of the parent); *see also Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015) ("Total ownership and shared management personnel are alone insufficient to establish the requisite level of control.").

Plaintiffs plead no other factual allegations about the relationship between Express Scripts Holding and its subsidiaries.  Because the "complaint makes almost no factual allegations regarding the nature of the parent-subsidiary relationship," *Williams*, 851 F.3d at 1022, Plaintiffs have failed to satisfy the alter ego test.  *See, e.g.*, *Apple Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp. 3d 42, 52 (N.D. Cal. 2020) ("To determine whether there is a sufficient unity of interest and ownership to support alter ego liability, courts consider factors like: commingling of funds, failure to maintain minutes or adequate corporate records, identification of the equitable owners with the domination and control of the two entities, the use of the same office or business locations, the identical equitable ownership of the two entities, the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual, and failure to adequately capitalize a corporation."); *Reynolds*, 481 F. Supp. 3d at 1007 (holding no personal jurisdiction under the alter ego test because the plaintiff "leaves multiple factors under the unity of

5

1   interest prong unaddressed—for example, whether the entities' funds were commingled, whether

2   one held itself out as liable for the debts of the other, whether one was a mere shell or conduit for

3   the affairs of the other, inadequate capitalization, disregard for corporate formalities, and

4   segregation of corporate records." (cleaned up)).

5        Plaintiffs have also failed to allege facts, or make any argument, to satisfy the second part

6   of the alter ego test: that a failure to disregard the separate identities of the subsidiary and parent

7   would result in fraud or injustice.  So, Plaintiffs have not met the requirements for the Court to

8   find Express Scripts, Inc., Medco, or Accredo are the alter ego of Express Scripts Holding for the

9   purposes of personal jurisdiction.

10        MSP's reliance on *Harris Rutsky & Co. Insurance Services v. Bell & Clements Ltd.*, 328

11   F.3d 1122, 1134 (9th Cir. 2003), for the proposition Express Scripts Holding's subsidiaries act as

12   agents of Express Scripts Holding in California, and therefore Express Scripts Holding is subject

13   to specific personal jurisdiction in California, is misplaced.  In *Harris Rutsky & Co. Insurance

14   Services*, the Ninth Circuit held, when analyzing specific personal jurisdiction, "a subsidiary's

15   contacts may be imputed to the parent where . . .  the subsidiary acts as the general agent of the

16   parent." *Id.* at 1134.  The court described an "agency test" which required "the plaintiff [] make a

17   prima facie showing that the subsidiary represents the parent corporation by performing services

18   'sufficiently important to the [parent] corporation that if it did not have a representative to perform

19   them, the [parent] corporation . . . would undertake to perform substantially similar services.'" *Id.*

20   at 1135 (quoting *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1405 (9th Cir. 1994)).  But in

21   *Daimler AG v. Bauman*, the Supreme Court rejected this agency test in the context of general

22   personal jurisdiction.  571 U.S. 117, 135 (2014) ("The Ninth Circuit's agency" doctrine . . .

23   "stacks the deck, for it will always yield a pro-jurisdiction answer" and therefore "appears to

24   subject foreign corporations to general jurisdiction whenever they have an in-state subsidiary or

25   affiliate" and does not comport with due process); *see also Ranza*, 793 F.3d at 1071 (explaining

26   "[t]he Supreme Court invalidated th[e agency] test" in *Daimler*).  Since then, the Ninth Circuit has

27   also rejected the agency test in the context of specific personal jurisdiction.  *See Williams*, 851

28   F.3d at 1024 (holding *Daimler*'s criticism of the agency test "applies no less in the context of

6

specific jurisdiction than in that of general jurisdiction" and "*Daimler*'s reasoning is clearly irreconcilable with the agency test").   So, the agency test cannot be the basis of this Court's exercise of specific personal jurisdiction.

Next, Plaintiffs assert the Court has personal jurisdiction over Express Scripts Holding because RICO provides "process . . . may be served in any judicial district of the United States" when required by the "ends of justice." 18 U.S.C. § 1965(b).  "For nationwide service to be imposed under section 1965(b)," Plaintiffs must establish (1) the Court has "personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy" (2) "there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators;" and (3) "a single nationwide RICO conspiracy" exists.  *Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986).

Plaintiffs assert they "explicitly allege the places of organization and locations of principal offices of each Defendant . . . which clearly demonstrate that there is no district in which a court would have personal jurisdiction over all the Defendants."[4]  (Dkt. No. 98 at 30.)  Not so.  While Plaintiffs may have demonstrated there is no district in which a Court would have general jurisdiction over all Defendants, Plaintiffs have failed to establish there is no district in which a Court has specific personal jurisdiction over all the Defendants.  *See Limcaco v. Wynn*, No. 21-56285, 2023 WL 154965, at *1 (9th Cir. Jan. 11, 2023), *cert. denied*, 143 S. Ct. 2612 (2023) (holding the plaintiff's allegation no district would be able to assert personal jurisdiction over all the alleged co-conspirators was "merely conclusory" and therefore insufficient to warrant nationwide service of process).  Indeed, if Plaintiffs' assertion that Express Script Holding's subsidiaries were its alter ego in California and all other Defendants were engaged in a conspiracy with illegal actions taking place in California is true, then California would appear to be such a district.  However, Plaintiffs fail to support that assertion, or the assertion no district would have personal jurisdiction over all Defendants, with any factual allegations.

So, the Court DISMISSES all claims against Express Scripts Holding for lack of personal

---

[4] Plaintiffs do not indicate where Accredo Health Group is organized.  (Dkt. No. 67 ¶ 48.)

United States District Court
Northern District of California

1    jurisdiction WITH LEAVE TO AMEND as to the alter ego theory of personal jurisdiction.  For

2    the reasons discussed above, the Court DISMISSES WITHOUT LEAVE TO AMEND all claims

3    against Express Scripts Holding as to the agency theory of personal jurisdiction.  Moreover, for

4    the reasons described below, the Court also DISMISSES WITHOUT LEAVE TO AMEND all

5    claims against Express Scripts Holding premised on RICO's nationwide service of process

6    provision.

### PLAINTIFFS' MOTION TO STRIKE ACTELION'S APPENDIX

7

8          The Court previously ordered Actelion's opening brief was not to exceed 50 pages.  (Dkt.

9    No. 88 at 2.)  Actelion then filed a motion to dismiss that was exactly 50 pages.  (Dkt. No. 89.)

10   Along with that motion, Actelion filed a 39-page appendix, consisting of an annotated chart of

11   "each payment that MSP's Assignors allegedly made for an Actelion Medication, and the reasons

12   why that payment fails to establish MSP's standing to bring the claims it asserts here."  (Dkt. No.

13   92.)

14         Plaintiffs move to strike the Appendix to Actelion's Motion to Dismiss, asserting the

15   Appendix includes arguments and therefore improperly exceeds the page limitations set for

16   Actelion.  (Dkt. No. 97.)  The Court GRANTS Plaintiffs' motion and will not consider the

17   appendix.

### PLAINTIFFS' MOTION FOR LEAVE TO FILE A SURREPLY

18

19         Plaintiffs moved for leave to file a surreply to Actelion's reply in support of its motion to

20   dismiss.  The Court GRANTS Plaintiffs' motion and considers the surreply in its analysis.

21

### ACTELION'S MOTION FOR LEAVE TO FILE A NOTICE OF SUPPLEMENTAL AUTHORITY

22

23         Actelion moved the Court for leave to file a notice of supplemental authority.  The Court

24   GRANTS the motion and considers *United Healthcare Services, Inc. v. United Therapeutics*

25   *Corp.*, No. 22-CV-2948, 2024 WL 1256266 (D. Md. Mar. 25, 2024).

26

27

28

United States District Court
Northern District of California

**ACTELION'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

## I. ARTICLE III STANDING

Plaintiffs "bear[] the burden of establishing [the elements of standing]." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Typically, "to satisfy Article III's standing requirements, a plaintiff must show . . . it has suffered an 'injury in fact.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). However, "an assignee can sue based on his assignor's injuries." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286 (2008). To do so, "the assignee must provide proof that an assignment occurred." *Brown v. Bank of Am., N.A.*, 660 F. App'x 506, 508 (9th Cir. 2016) (citing *Britton v. Co–op Banking Grp.*, 4 F.3d 742, 746 (9th Cir. 1993)).

Plaintiffs name 38 Assignors. For each, Plaintiffs must prove (1) injury-in-fact (e.g., was the Assignor harmed by the alleged scheme, for instance, by making more payments or paying more for drugs); and (2) the Assignor assigned each claim at issue to one of the named Plaintiffs through a valid chain of assignment. Since Article III standing is a constitutional requirement that limits the Court's jurisdiction, the Court first addresses whether MSP's Assignors suffered an injury in fact sufficient to establish Article III standing. *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 825 (9th Cir. 2011) (explaining the "district court should have undertaken an independent analysis of Article III standing before determining standing under" a statute).

Plaintiffs allege the following 38 Assignors:

1. SummaCare, Inc. ("SMCR"), a Medicare Advantage Organization. (Dkt. No. 67 ¶ 74.)
2. Alianza Profesional de Cuidado Medico Inc. ("APCM"), a downstream entity (*Id.* ¶ 80.)
3. Arse, Inc. ("ARSI") (*Id.* ¶ 84.)
4. Administración de Servicios de Atención Primaria, Inc. ("ASAP") (*Id.* ¶ 88.)
5. AvMed, Inc. ("ADVI" or "AvMed") (*Id.* ¶ 92.)
6. Blue Cross & Blue Shield of Rhode Island ("BCBSRI") (*Id.* ¶ 96.)
7. Broward Primary Partners, LLC ("BPPL") (*Id.* ¶ 103.)
8. Cano Health, LLC ("CANH") (*Id.* ¶107.)
9. Group Health Incorporated and Health Insurance Plan of Greater New York ("EHTH" or "Emblem") (*Id.* ¶ 110.)
10. Fallon Community Health ("FCHP") (*Id.* ¶ 116.)
11. Family Physicians of Winter Park, P.A. ("FPGI") (*Id.* ¶ 120.)
12. Grupo Cuidado Geriatrico Integral ("GCMMI") (*Id.* ¶ 126.)

*United States District Court*
*Northern District of California*

13. Health Care Advisor Services, Inc. ("HCAS") (*Id.* ¶ 130.)
14. Health Alliance Medical Plans, Inc. ("HEAL") (*Id.* ¶ 134.)
15. Health First Health Plans, Inc. ("HFHP") (*Id.* ¶ 141.)
16. Risk Watchers, Inc. ("HPRW") (*Id.* ¶ 148.)
17. La Colonia Medical Center, Inc. ("LCMC") (*Id.* ¶ 155.)
18. Med Caribe, C.S.P. ("MCCSP") (*Id.* ¶ 158.)
19. Medical Consultants Management, LLC ("MCML") (*Id.* ¶ 162.)
20. Medical IPA of the Palm Beaches, Inc. ("MIPAPB") (*Id.* ¶ 167.)
21. Network Health, Inc. ("NHPN") (*Id.* ¶ 172.)
22. Ponce Advance Medical Group, P.S.C. ("PAMG") (*Id.* ¶ 178.)
23. Palm Beach Primary Care Associations, Inc. ("PBPCA") (*Id.* ¶ 183.)
24. Premier Care Partners, LLC ("PCPS") (*Id.* ¶ 188.)
25. PDP Health Management, Inc. ("PDPH") (*Id.* ¶ 193.)
26. Physician H.M.O., Inc. ("PHMO") (*Id.* ¶ 198.)
27. Policlinicas Medicas Asociadas, Inc. ("PMAS") (*Id.* ¶ 203.)
28. Primary Physicians Medical Service, LLC ("PPMS") (*Id.* ¶ 208.)
29. Physician Access Urgent Care Group, LLC ("PPP") (*Id.* ¶ 213.)
30. Quality Care Physicians, LLC ("QCPL") (*Id.* ¶ 218.)
31. Quality Medical Care, Inc. ("QMG") (*Id.* ¶ 223.)
32. Suncoast Provider Network, Inc. ("SCPN") (*Id.* ¶ 228.)
33. University Health Care MSO, Inc. ("UNHC") (*Id.* ¶ 233.)
34. ConnectiCare, Inc. ("CONC" or "ConnectiCare") (*Id.* ¶ 238.)
35. MCCI Group Holdings, LLC8 ("MCCI") (*Id.* ¶ 244.)
36. Professional Health Choice ("PHC") (*Id.* ¶ 249.)
37. WellCloud, LLC A/K/A JustWell Health Partners, Inc. ("JHPI" or "WellCloud") (*Id.* ¶ 257.)
38. Pura Vida Medical Center, LLC ("PVMC") (*Id.* ¶ 261.)

Plaintiffs' Assignors "provide health insurance coverage." (Dkt. No. 67 ¶ 2.) MSP allege the Assignors "pay for a portion of beneficiaries' prescriptions," so "Defendants' Scheme, which increased prices and utilization of the Subject Drugs, necessarily resulted in injury to the Assigners." (*Id.* ¶ 306.) MSP further assert their Assignors "would not have (and could not have) paid" for the claims for Actelion drugs "if Defendants had not concealed their Scheme." (*Id.* ¶ 587.) In total, MSP claim "Assignors paid approximately $42 million in claims on behalf of covered patients receiving the Actelion Drugs from *at least* January 1, 2006 (when the Scheme started), through present." (*Id.* ¶ 71.)

But "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press." *TransUnion LLC v. Ramirez,* 594 U.S. 413, 431 (2021). So, Plaintiffs must show how *each* Assignor was injured by Defendants' conduct.

Ten of Plaintiffs' Assignors are Medicare Advantage organizations.[5]  "Under the Medicare Advantage program, individuals eligible for Medicare may enroll in health insurance plans offered by private entities known as Medicare Advantage organizations." *Glob. Rescue Jets, LLC v. Kaiser Found. Health Plan, Inc.*, 30 F.4th 905, 909 (9th Cir. 2022) (citing 42 U.S.C. § 1395w-21(a)(1)).  These Medicare Advantage organizations contract with the Centers of Medicare and Medicaid Services ("CMS").  CMS "pays a fixed monthly sum per enrollee. . .  and in return the Medicare Advantage organization agrees to provide the health care services that the federal government would have paid." *Id.*  "A Medicare Advantage organization thus assumes, with respect to each enrollee, 'full financial risk on a prospective basis for the provision of the health care services' that would have been covered under original Medicare." *Id.* (citing 42 U.S.C. § 1395w-25(b)).

The other 28 Assignors are first-tier or downstream entities.[6]  The Code of Federal Regulations defines a "[f]irst tier entity" as "any party that enters into a written arrangement. . . with an [Medicare Advantage] organization or applicant to provide administrative services or health care services for a Medicare eligible individual under the [Medicare Advantage] program." 42 C.F.R. § 422.2.  It defines a "[d]ownstream entity" as "any party that enters into a written

---

[5] Plaintiffs represent the following ten Assignors are Medicare Advantage organizations: (1) AvMed, Inc.; (2) Blue Cross Blue Shield of Rhode Island; (3) Cano Health, LLC; (4) Group Health Incorporated and Health Insurance Plan of Greater New York; (5) ConnectiCare; (6) Fallon Community Health; (7) Health Alliance Medical Plans, Inc.; (8) Health First Health Plans, Inc; (9) Network Health, Inc., and (10) SummaCare, Inc..  (Dkt. No. 99 at 32 n.25.)

[6] Plaintiffs represent the following 28 Assignors are first-tier or downstream entities: (1) Alianza Profesional de Cuidado Medico Inc.; (2) Arse, Inc.; (3) Administración de Servicios de Atención Primaria, Inc.; (4) Broward Primary Partners, LLC; (5) Family Physicians of Winter Park, P.A.; (6) Grupo Cuidado Geriatrico Integral; (7) Health Care Advisor Services, Inc.; (8) Risk Watchers, Inc.; (9) La Colonia Medical Center, Inc.; (10) Med Caribe, C.S.P.; (11) Medical Consultants Management, LLC; (12) Medical IPA of the Palm Beaches, Inc.; (13) Ponce Advance Medical Group, P.S.C.; (14) Palm Beach Primary Care Associations, Inc.; (15) Premier Care Partners, LLC; (16) PDP Health Management, Inc.; (17) Physician H.M.O., Inc.; (18) Policlinicas Medicas Asociadas, Inc.; (19) Primary Physicians Medical Service, LLC; (20) Physician Access Urgent Care Group, LLC; (21) Quality Care Physicians, LLC; (22) Quality Medical Care, Inc.; (23) Suncoast Provider Network, Inc.; (24) University Health Care MSO, Inc.; (25) MCCI Group Holdings, LLC; (26) Professional Health Choice; (27) WellCloud, LLC A/K/A JustWell Health Partners, Inc.; (28) Pura Vida Medical Center, LLC.

arrangement . . . with persons or entities involved with the [Medicare Advantage] benefit, below the level of the arrangement between an [Medicare Advantage] organization (or applicant) and a first tier entity." *Id.*

### A.    First-Tier and Downstream Entities

Actelion makes a factual challenge to the Court's subject matter jurisdiction and argue Plaintiffs lack standing (Dkt. No. 89 at 35), so Plaintiffs must "present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989).  Moreover, in assessing such a challenge, the Court "need not presume the truthfulness of the plaintiffs' allegations." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

MSP have not established injury-in-fact for any first tier or downstream entities because they fail to provide sufficient evidence supporting a finding these entities were injured by payments for Actelion drugs.  Specifically, Plaintiffs fail to provide evidence showing that these entities were not fully reimbursed for any payments for Actelion drugs.

In their Amended Complaint, Plaintiffs allege the first tier and downstream entities are "under a full risk contract with the Centers for Medicare and Medicare Services to pay for Part D prescription drugs to its members or beneficiaries, including, but not limited to, the Actelion Drugs."  (Dkt. No. 67 at 4 n.3.)  But, in their opposition, Plaintiffs instead assert the "first-tier and/or downstream entities [] contracted with [Medicare Advantage organizations]"—rather than directly with the Centers for Medicare and Medicare Services—"to provide certain services for Medicare beneficiaries."  (Dkt. No. 99 at 31.)  Plaintiffs do not provide any contracts for any of the first tier or downstream entities.

The Court does not accept as true Plaintiffs' assertion the first tier and downstream entities are "under a full risk contract" to pay for Actelion drugs as that allegation is contradicted by Plaintiffs' opposition.  Moreover, the allegation contradicts the federal definition of first tier and downstream entities.  As a result, Plaintiffs fail to establish Article III standing for first tier and downstream entities because the Court cannot find that any such entities were injured by Defendants' alleged scheme.  Indeed, the Court cannot determine whether any increased cost or

quantity of Actelion drugs distributed would have harmed such entities (if, for instance, they were under a full risk contract) or benefited them (for example, if they got paid according to the number of Actelion drugs distributed and reimbursed for the cost of the drugs).

MSP's attached "list of claims," is insufficient to demonstrate injury-in-fact for first tier or downstream entities.  (Dkt. No. 67-55 at 2.)  For example, the chart includes the following:

| Family Physicians of Winter Park, Inc. | G.Z. | 15468813-FPGI-WELL | 11-5-2013 | Florida | Series 23-05-1944 (MSP Recovery Claims, Series LLC) | $7209.65 | Not Available | Opsumit |
| Family Physicians of Winter Park, Inc. | I.M.S. | 12525721-FPGI-WELL | 11-23-2015 | Florida | Series 23-05-1944 (MSP Recovery Claims, Series LLC) | $7589.11 | Not Available | Opsumit |

(*Id.* at 7.)  MSP further alleges Family Physicians of Winter Park, Inc. "provided payment for G.Z. in Florida . . . for the Actelion drug Opsumit" on November 5, 2013 (the first row in the above excerpted claims table) and also "provided payment for I.M.S. in Florida . . . for the Actelion drug Opsumit" on November 23, 2015 (the second row in the above excerpted claims table).  (Dkt. No. 67 ¶ 125.)  However, without any information about the contract between Family Physicians of Winter Park and a Medicare Advantage Organization (or other entity), Plaintiffs have not shown Family Physicians of Winter Park was injured by its payments for Actelion drugs.  For example, the Medicare Advantage Organization or other entity that contracted with Family Physicians of Winter Park, Inc. may have fully reimbursed Family Physicians of Winter Park, Inc. for its payment for Actelion drugs.  So, the record is insufficient to support a finding of injury-in-fact.

Plaintiffs cite *MSP Recovery Claims v. ACE American Insurance Co.*, 974 F.3d 1305, 1316 (11th Cir. 2020), arguing it demonstrates "Plaintiffs have standing the bring [sic] the claims of Assignors that are downstream from first tier entities."  (Dkt. No. 99 at 32.)  But the issue presented to the Eleventh Circuit in *MSP Recovery Claims v. ACE American Insurance Co.* differs from this case: the Eleventh Circuit considered whether the plaintiffs, who were assigned claims from non-Medicare Advantage organizations were "categorically barred from seeking damages under the Medicare Secondary Payer Act," 974 F.3d at 1312, whereas in this case Plaintiffs do not bring suit under the Medicare Secondary Payer Act.  So, the Eleventh Circuit's holding that non-Medicare Advantage organizations are not "categorically barred from seeking damages under the Medicare Secondary Payer Act," *id.*, is not relevant here.

13

Plaintiffs have therefore failed to establish standing for any of the first-tier or downstream entity Assignors, and so the claims of such entities (listed below) are DISMISSED without prejudice:

1. Alianza Profesional de Cuidado Medico Inc.
2. Arse, Inc.
3. Administración de Servicios de Atención Primaria, Inc.
4. Broward Primary Partners, LLC
5. Family Physicians of Winter Park, P.A.
6. Grupo Cuidado Geriatrico Integral
7. Health Care Advisor Services, Inc.
8. Risk Watchers, Inc.
9. La Colonia Medical Center, Inc.
10. Med Caribe, C.S.P.
11. Medical Consultants Management, LLC
12. Medical IPA of the Palm Beaches, Inc.
13. Ponce Advance Medical Group, P.S.C.
14. Palm Beach Primary Care Associations, Inc.
15. Premier Care Partners, LLC
16. PDP Health Management, Inc.
17. Physician H.M.O., Inc.
18. Policlinicas Medicas Asociadas, Inc.
19. Primary Physicians Medical Service, LLC
20. Physician Access Urgent Care Group, LLC
21. Quality Care Physicians, LLC
22. Quality Medical Care, Inc.
23. Suncoast Provider Network, Inc.
24. University Health Care MSO, Inc.
25. MCCI Group Holdings, LLC
26. Professional Health Choice
27. WellCloud, LLC A/K/A JustWell Health Partners, Inc.
28. Pura Vida Medical Center, LLC

**B.     Medicare Advantage Organizations**

Ten Assignors—AvMed; Blue Cross Blue Shield of Rhode Island; Cano Health; Group Health Incorporated and Health Insurance Plan of Greater New York; ConnectiCare; Fallon Community Health; Health Alliance Medical Plans; Health First Health Plans; Network Health, and SummaCare—are Medicare Advantage Organizations.  (Dkt. No. 99 at 32 n.25.)  Plaintiffs allege each of these organizations paid for Actelion drugs for individuals, and because Defendants' scheme raised the price and quantity of Actelion drugs dispensed, each of these entities paid more money to provide such drugs.  (Dkt. No. 67 ¶¶ 2, 306, 587.)  Because the

Centers of Medicare and Medicaid Services pays a fixed sum per individual insured by these organizations, and because Medicare Advantage organizations contract directly with the Centers of Medicare and Medicaid Services, *see Glob. Rescue Jets,* LLC, 30 F.4th at 909 (citing 42 U.S.C. § 1395w-21(a)(1)), Plaintiffs have also plausibly pled the Medicare Advantage organizations paid such increased costs without getting reimbursed for them. (Dkt. No. 26 at 4 n.3.) Further, Plaintiffs assert each of these entities paid for Actelion drugs, providing a claims table indicating where and when the drugs were dispensed. (Dkt. No. 67-55.) So, Plaintiffs have shown that Medicare Advantage Organizations that paid for Actelion drugs suffered injury-fact sufficient for constitutional standing. So, the standing question for these Assignors, then, is whether they assigned the cases MSP assert in this lawsuit to MSP. The Court discusses each in turn.

### 1.    AvMed, Inc.

The contract assigning AvMed's claims to MSP is dated June 25, 2019. (Dkt. No. 113-4 at 14.) The agreement conveys "any and all of [AvMed's] right, title, ownership, and interest in and to [] all Claims existing on the date hereof" to Series 17-030615. (*Id.* at 2-3.) MSP's claims from AvMed indicate AvMed paid for Actelion's drugs in 2017 and 2018. (Dkt. No. 67-55 at 2.) Accordingly, MSP have sufficiently pled assignment for AvMed.

### 2.    Blue Cross Blue Shield of Rhode Island

The original assignment, dated May 30, 2019, assigned Blue Cross Blue Shield of Rhode Island's claims to "MSP Recovery, LLC." (Dkt. No. 113-5 at 2, 8.) The agreement conveys "any and all of" Blue Cross Blue Shield of Rhode Island's "right, title, ownership and interest in . . . all [c]laims for which it has sent claims data to MSP," along with other causes of actions and claims related to healthcare services in the past. (*Id.* at 3.) MSP's claims from Blue Cross Blue Shield of Rhode Island indicate Blue Cross Blue Shield of Rhode Island paid for Actelion's drugs in 2013. (Dkt. No. 67-55 at 2.)

MSP admit the assignments of Blue Cross & Blue Shield of Rhode Island contain language limiting assignability based on the consent of the Assignor. (Dkt. No. 99 at 35; *see also* Dkt. No. 113-5 at 7 ("MSP Recovery may, upon the advanced written consent of client, assign this Agreement, and any of its rights and obligations under this Agreement, the Assigned Claims and

15

the Claims Documents to an affiliated entity.").)  MSP Recovery, LLC did assign its claims under the Blue Cross Blue Shield of Rhode Island assignment agreement to "Series 16-05-461, a designated series of MSP Recovery Claims, Series LLC."  (*Id.* at 9.)  MSP also attach a "letter" indicating Blue Cross & Blue Shield of Rhode Island "approves and consents to the assignment of the Recovery Agreement & Assignment by MSP Recovery, LLC to . . . MSP Recovery Claims Series LLC, or any of its designated series, including but not limited to, Series 16-05-461."  (*Id.* at 12.)  Series 16-05-461 later assigned the claims to Series 44-30-461, (*id.* at 15), who then assigned all claims to Series 23-05-1941.  (*Id.* at 17.)

So, MSP have established the chain of assignment, and established Blue Cross Blue Shield of Rhode Island gave consent for the assignment from MSP Recovery, LLC to MSP Recovery Claims, Series LLC.  So, MSP have met its burden to establish standing to pursue claims Blue Cross Blue Shield of Rhode Island assigned.

### 3.    Cano Health

Cano Health initially assigned all claims "arising from and related to the claims data transferred to Assignee (or its affiliates or service providers, including MSP Recovery) for the period encompassing dates of services from October 17, 2016 and continuing up to, including and through March 31, 2020" to Series 17-03-569, a designated series of MSP Recovery Claims, Series LLC.  (Dkt. No. 113-7 at 2-3.)  MSP's claims from Cano Health indicate Cano Health paid for Actelion's drugs in 2018 and 2019—within the period of assigned claims.  (Dkt. No. 67-55 at 2-3.)

MSP admit the assignment of Cano Health contains language limiting assignability based on the consent of the Assignor without providing any specific evidence that consent was obtained. (Dkt. No. 99 at 35; *see also* Dkt. No. 113-7 at 10 ("Upon the consent of Assignor. . . Assignee may assign this Agreement and the Assignment, . . . to an affiliated or related entity controlled in whole or in part by Assignee.")  But, there is no evidence the series ever re-assigned the claims and MSP Recovery Claims, Series LLC is a Plaintiff in this suit.  So, MSP have sufficiently pled standing for Cano Health's claims.

4.      **Group Health Incorporated and Health Insurance Plan of Greater New York**

Defendants attack the assignment of Group Health Incorporated and Health Insurance Plan of Greater New York, asserting the assignment "convey[s] nothing more than the right to seek 'reimbursement' from 'primary payers' for expenses they are required to bear under the [Medicare Secondary Payer] Act." (Dkt. No. 89 at 37). MSP seeks to recover Group Health Incorporated and Health Insurance Plan of Greater New York's claims arising from payments for Actelion drugs from 2013-2015. (Dkt. Nos. 67 ¶ 115; 67-55 at 4.) Group Health Incorporated and Health Insurance Plan of Greater New York's assignment provides the following:

Assignor has certain legal and equitable rights to seek reimbursement and/or recover payments from primary payers and any other party or entity that may be responsible to Assignor directly or through rights conferred on the Assignor pursuant to state and/or federal law pertaining to beneficiaries, for Health Care Services provided to Assignor's Medicare . . . enrollees arising under state and/or federal laws . . . that provide for the reimbursement of payments made by the Assignor for such Medicare services . . .including the right to recover claims for Medicare Health Care Services that are billed on a fee for service basis and all outstanding liens, potential liens, lien rights and subrogation recovery rights, legal or equitable, in favor of Assignor, including in any litigation, such as but not limited to mass tort actions, class actions, and multi-district litigation for which a primary payer has demonstrated responsibility, all of the foregoing defined as the "Medicare Recovery Claims;" . . .

Assignor wishes to assign to Assignee all right, title, interest in and ownership of Medicare Recovery Claims – excluding Medicare Recovery claims . . . that, as of the Effective Date, have been assigned to and/or are being pursued by other recovery vendors, including, but not limited to, The Rawlings Group -- related to Medicare Health Care Services that were rendered and paid for by Assigner during the six (6) year period beginning September 29, 2011 and ending September 29, 2017 (hereinafter, such Medicare Recovery Claims shall be referred to as the "**Assigned Medicare Recovery Claims**") . . .

[T]he Assigned Medicare Recovery Claims do not include claims that Assignor my have against its members, enrollees, and/or contracted providers, regardless of the nature of the claims . . .

Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee . . . any and all of Assignor's right, title, ownership and interest in and to all Assigned Medicare Recovery Claims, whether based in contract, tort, statutory right, and any and all rights . . . to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Medicare Recovery Claims and all rights and claims against primary payers and/or subject to the definition of Assigned Medicare Recovery Claims, third parties that may be liable to Assignor arising

17

from or relating to the Assigned Medicare Recovery Claims, including claims under consumer protection statutes and laws.

(Dkt. No. 113-8 at 2-4.)  Given the absence of evidence demonstrating this assignment does not cover the claims asserted in this lawsuit, the Court holds at this stage of the lawsuit, MSP have sufficiently pled standing based on a valid assignment for Group Health Incorporated and Health Insurance Plan of Greater New York.

### 5.    ConnectiCare

MSP's claims assigned from ConnectiCare indicate ConnectiCare paid for Actelion's drugs in 2011 and 2012.  (Dkt. No. 67-55 at 7.)   Connecticare assigned its claims to Series 15-09-157, "a designated series of MSP Recovery Claims, Series LLC . . . and its affiliated entity MSP Recovery, LLC" in 2018.  (Dkt. No. 113-32 at 13-14.)  MSP Recovery, LLC then transferred its claims in the assignment to Series 15-09-157, a designated series of MSP Recovery Claims, Series LLC.  (*Id.* at 16.)

MSP admit the ConnectiCare assignment contains language conditioning further assignment upon the Assignor's consent.  (Dkt. No. 99 at 35 (referring to "ConnectiCare" as "CONC"); *see also* Dkt. No. 113-32 at 7 ("Upon thirty (30) days' prior written notice given by Purchaser to Seller explaining the purpose of a proposed assignment, and express prior written approval by Seller . . . Purchaser may assign this Agreement . . . to any entity controlled in whole or in part by Purchaser.").)  But, even if the second assignment—from MSP Recovery, LLC to Series 15-09-157—is invalid because of on ConnectiCare's lack of consent, the first assignment from ConnectiCare to MSP Recovery, LLC and Series 15-09-157 remains valid.  Since MSP Recovery Claims, Series LLC is a Plaintiff in this case, at this stage, MSP have sufficiently pled standing based on a valid assignment to ConnectiCare.

### 6.    Fallon Community Health Plans

The contract assigning Fallon Community Health Plans' claims to MSP is dated June 19, 2017.  (Dkt. No. 113-9 at 2.)  The agreement conveys "any and all of [Fallon Community Health Plus'] right, title, ownership, and interest in and to all Claims existing on the date hereof."  (*Id.* at 5.)  MSP's claims from Fallon Community Health indicate Fallon Community Health paid for

Actelion's drugs in 2010.  (Dkt. No. 67-55 at 3-4.)  Accordingly, MSP have sufficiently pled standing based on a valid assignment for Fallon Community Health.

### 7.   Health Alliance Medical Plans

The contract assigning Health Alliance Medical Plans' claims to MSP is dated April 10, 2019.  (Dkt. No. 113-13 at 14.)  The agreement provides "[w]ith the exception of mass tort claims, [Health Alliance Medical Plans] assigns . . . any and all of [its] right, title, ownership, and interest in and to [] all Claims existing on the date hereof."  (*Id.* at 5.)  MSP's claims from Health Alliance Medical Plans indicate Health Alliance Medical Plans paid for Actelion's drugs in 2013.  (Dkt. No. 67-55 at 3.)  Accordingly, MSP have sufficiently pled standing based on a valid assignment for Health Alliance Medical Plans.

### 8.   Health First Health Plan

The contract assigning Health First Health Plans' claims to MSP is dated April 28, 2016. (Dkt. No. 113-38 at 2.)  The agreement conveys "any and all of [Health First Health Plans'] right, title, ownership, and interest in and to all Claims existing on the date hereof."  (*Id.* at 5.)  MSP's claims from Health First Health Plan indicate Health First Health Plan paid for Actelion's drugs in 2010.  (Dkt. No. 67-55 at 4.)  Accordingly, MSP have sufficiently pled standing based on a valid assignment for Health First Health Plan.

### 9.   Network Health

MSP's assigned claims from Network Health indicate Network Health paid for Actelion's drugs in 2013.  (Dkt. No. 67-55 at 5.)   Network Health originally assigned "[a]ll claims that have been or can be identified by MSP Recovery as being recoverable pursuant to any contractual, statutory, equitable or legal basis" to MSP Recovery, LLC in 2017.  (Dkt. No. 113-19 at 2, 16.)

MSP Recovery, LLC then transferred the claims to Series 15-09-355, LLC.  (*Id.* at 37.) MSP admit the assignments of Network Health claims contain language conditioning further assignability on the Assignor's consent.  (Dkt. No. 99 at 35.)  Network Health later acknowledged the assignment to Series 15-09-355, LLC.  (Dkt. No. 113-19 at 40.)  Moreover, Jorge A. Lopez, the "authorized corporate representative of Plaintiffs, MSP Recovery Claims, Series LLC, MSPA Claims 1, LLC and MSP Recovery Claims PROV, Series LLC," submitted a declaration stating he

has "personal knowledge regarding Plaintiffs' claims assignment agreements," and "[a]ny and all consents, to the extent they may have been required, have been obtained." (Dkt. No. 99-6 ¶¶ 1, 2, 4.)  The Court holds Network Health's acknowledgement, coupled with the declaration of Jorge A. Lopez, is sufficient for MSP to establish standing to pursue Network Health's claims at this stage of the litigation.

### 10.     SummaCare

MSP's claims from SummaCare indicate SummaCare paid for Actelion's drugs in 2009 and 2011.  (Dkt. No. 67-55 at 7.)  SummaCare initially assigned "all Claims existing on the date hereof, whether based in contract, tort, statutory right . . . to pursue and/or recover monies" to MSP Recovery, LLC in 2017.  (Dkt. No. 113-1 at 2, 5.)

MSP admit the assignments of SummaCare's claims also contain language conditioning assignability on the Assignor's consent.  (Dkt. No. 99 at 35; *see also* Dkt. No. 113-1 at 7 ("This Agreement may not be assigned without the prior written consent of the other party.").)  But, MSP Recovery, LLC later assigned the claims to Series 16-11-509 LLC, a series of MSP Recovery Claims, Series LLC.  (*Id.* at 21.)  In a later agreement, SummaCare transferred more claims to Series 21-06-1592.  (Dkt. No. 113-1 at 50.)  In that later agreement, SummaCare acknowledged "MSP Recovery assigned" the previous claims "to Series 16-11-509."  (*Id.* at 43.)

So, as with Network Health, the Court holds SummaCare's acknowledgement, coupled with the declaration of Jorge A. Lopez, is sufficient for MSP to establish standing to pursue SummaCare's claims at this stage of the litigation.

* * *

In sum, MSP have shown Article III standing based on assignment as to the claims from all Medicare Advantage organization Assignors: (1) AvMed, (2) Blue Cross Blue Shield of Rhode Island, (3) Cano Health, (4) Group Health Incorporated and Health Insurance Plan of Greater New York, (5) ConnectiCare, (6) Fallon, (7) Health Alliance Medical Plans, (8) Health First Health Plans, (9) Network Health, and (10) SummaCare survive.  The claims based on assignment from all other Assignors are dismissed without prejudice for lack of constitutional standing.

## II. RICO STATUTORY STANDING

"Standing involves two distinct inquiries"—(1) constitutional standing, which asks "whether a plaintiff has suffered sufficient injury to satisfy the 'case or controversy' requirement of Article III" of the Constitution; and (2) statutory standing, which asks "whether a statute has conferred 'standing' on that plaintiff." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). Actelion argues MSP lacks statutory standing as a matter of law.

RICO includes a private right of action with treble damages that allows private parties to sue for injuries to their "business or property" caused "by reason of" a defendant's violation of RICO. The private right of action states:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c). So, to have statutory standing under § 1964(c), "a civil RICO plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was 'by reason of' the RICO violation, which requires the plaintiff to establish proximate causation." *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). "Proximate cause for RICO purposes . . . requires some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (quotation marks and citations omitted). "A link that is too remote, purely contingent, or indirect is insufficient." *Id.* (cleaned up).

MSP do not have statutory standing under § 1964(c)'s plain meaning. They were not injured in their business or property by anything Defendants did. MSP nonetheless insist that because they received RICO assignments from the health care insurers who were injured in their property by Defendants' conduct, they have derivative statutory standing for the RICO claims. The Court is unpersuaded.

### A. RICO's Plain Text Controls Under the Ninth Circuit's En Banc Holding in *Silvers*

In *Silvers v. Sony Pictures Ent., Inc.*, an en banc panel of the Ninth Circuit held "an

assignee who holds an accrued claim for copyright infringement, but who has no legal or beneficial interest in the copyright itself," could not institute an action for infringement.  402 F.3d 881, 883 (9th Cir. 2005) (en banc).  The court explained "[c]opyright . . . is a creature of statute," so "the only rights that exist under copyright law are those granted by statute."  *Id.* at 883-84.  The 1976 Copyright Act indicates who is "legally authorized to sue for infringement of a copyright," *id.*, providing:

> The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it.

17 U.S.C. § 501(b).  So, the Ninth Circuit concluded "[t]o be entitled to sue for copyright infringement, the plaintiff must be the 'legal or beneficial owner of an exclusive right under a copyright.'"  *Silvers*, 402 F.3d at 884.  The Ninth Circuit further detailed the "exclusive rights" provided by the copyright act—including the rights to reproduce copyrighted works and to distribute copies of those works.  *Id.* (quoting 17 U.S.C. § 106).  "The right to sue for an accrued claim for infringement is not an exclusive right under" the Copyright Act.  *Id.*  The Ninth Circuit therefore held that under the private action provision of the copyright statute, 17 U.S.C. § 501(b), "the plaintiff must have a legal or beneficial interest in at least one of the exclusive rights described" in the statute to sue.  *Id.* at 885.  The court explained while "[t]he statute does not say expressly that *only* a legal or beneficial owner of an exclusive right is entitled to sue . . . under traditional principles of statutory interpretation, Congress' explicit listing of who *may* sue for copyright infringement should be understood as *an exclusion of others* from suing for infringement."  *Id.*  Moreover, there were "two particularly important reasons to apply such a presumption" to the Copyright Act: (1) because "Copyright is a creature of statute," the court would "not lightly insert common law principles that Congress has left out;" and (2) "the durational limitation in § 501(b) shows that Congress restricted even the legal or beneficial owner of a copyright; the owner is not entitled to sue unless the alleged infringement occurred 'while he or she [was] the owner of it.'  In other words, Congress' grant of the right to sue was carefully circumscribed."  *Id.*  The court also consulted legislative history and analogized to patent law,

22

1    finding both supported its conclusion.

2          Applying *Silvers*, only a plaintiff which has itself been injured in its business or property

3    by a RICO violation has statutory standing to bring a RICO claim.  Like the Copyright Act,

4    RICO's private right of action is a creature of statute.  Indeed, the common law provided no basis

5    for the recovery of treble damages.  *See Rayonier, Inc. v. Polson*, 400 F.2d 909, 918 n.11 (9th Cir.

6    1968) ("[C]ertainly the treble damage recovery provided by [a Washington timber trespass] statute

7    was not contemplated at common law.").  In drafting RICO, Congress created a new, statutory

8    cause of action for damages.  *See SouthStar Funding, LLC v. Sprouse*, No. 3:05-CV-253-W, 2007

9    WL 812174, at *4 (W.D.N.C. Mar. 13, 2007) ("RICO damages are purely a creature of statute and

10   thus limited to the extent of the statutory grant.").  In drafting the private action provision,

11   Congress delineated who could bring RICO claims.  While RICO does not durationally limit suits

12   in the same way the copyright statute does, RICO does carefully circumscribe who can sue: its

13   proximate cause requirements ensure only those directly injured by RICO violations can bring

14   suit.  Because Congress limited RICO's private cause of action to those directly injured, assignees

15   who are not directly injured are unable to bring RICO claims.

16         MSP first attempt to avoid *Silvers*' holding by asserting they "are not merely assignees of a

17   legal claim," but also "purchasers and title owners of the underlying property," and therefore are

18   not suing under a bare assignment but rather as owners of the property that was injured.  (Dkt. No.

19   121 at 7.)  As evidence, MSP assert "the vast majority of the Assignments explicitly refer to the

20   assigned claims as the exclusive or sole 'property' of MSP Recovery of its assigns."  (Dkt. No. 99

21   at 27 n.19.)  MSP argue they are assignees of "receivables," and those receivables constitute

22   property.  (*Id.* at 27.)  But those "receivables" are simply the right to collect money, and no other

23   property rights.  Because MSP are unable to identify any property or thing that has any legal

24   existence or value independent of the right to sue, this argument fails.

25         MSP next contend *Silvers* does not apply to RICO for two reasons: (1) the copyright

26   statute "*spoke directly to the matter of assignability*," while the RICO statute does not; and (2)

27   "copyright is purely a creature of statutory construction, not rooted in the common law," whereas

28   RICO has common law origins.  (Dkt. No. 99 at 22.)  As to MSP's first contention: as discussed

United States District Court
Northern District of California

above, the *Silvers* court did not hold the copyright statute directly prohibited assignees from suing—indeed, the copyright statute does not explicitly reference "assignability." *See Silvers*, 402 F.3d at 885 ("We think the meaning of § 501(b) [as to assignability] is clear, but we recognize that its omission explicitly to address the present question may create an ambiguity.").  Rather, the court held while the copyright "statute does not say expressly that *only* a legal or beneficial owner of an exclusive right is entitled to sue . . . under traditional principles of statutory interpretation, Congress' explicit listing of who *may* sue for copyright infringement should be understood as an *exclusion of others* from suing for infringement." *Id.*  Much like the copyright statute, RICO carefully circumscribes who can sue, and by limiting its private right of action to those directly and proximately injured by a RICO violation, the statute excludes others—such as assignees with no direct involvement in the claim—from suing.

MSP's second argument—that this Court should read federal common law principles of assignability into RICO—also fails, because, like the copyright statute, RICO's private right of action "is purely a creature of statutory construction."  (Dkt. No. 99 at 22.)  MSP contend "RICO claims sound in tort," and therefore RICO incorporates historical common law provisions, including general common law principles of assignability.  (*Id.* at 25.)  But, while RICO claims involve torts—e.g., injuries to people and property—the RICO private right of action is statutory in nature.  As discussed above, there is no common law right to recover treble damages.  Instead of focusing on the RICO statute's actual text, MSP would have the Court zoom out and hold that because, at a high level of abstraction, RICO involves "property rights," RICO stems from common law ideas of torts and property rights and those common law roots should continue to be read into the statute.  However, at that level of abstraction, copyright law also involves "property rights," as it enshrines the right to the proceeds stemming from a particular creation.  Copyright law is a creature of statute because Congress created the manner of deriving value from those rights.  And so it is with RICO—while RICO involves tort violations, *Congress* created a private right of action to sue for treble damages for those violations and therefore it is *Congress* that delineates who can sue under that private right of action.

Finally, MSP cite a series of cases for the proposition courts should generally read

24

common law principles into statutes.  But those cases indicate Congress can abrogate such principles as well.  *See, e.g.*, *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 457 (2012) ("'Congress is understood to legislate against a background of common-law adjudicatory principles.' . . . But Congress plainly can override those principles." (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991)); *Solimino*, 501 U.S. at 108 ("[W]here a common-law principle is well established . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." (cleaned up)).   In limiting RICO's private right of action to only those injured in business or property, Congress expressed its intent to override any common law assumption of assignability.

Citing *Beck v. Prupis*, MSP argue the Supreme Court has held "Congress meant to incorporate common-law principles when it adopted RICO."  529 U.S. 494, 504 (2000).  But *Beck*'s holding was much narrower.  In *Beck*, the Supreme Court explained "when Congress uses language with a settled meaning at common law, Congress presumably" intends to convey that meaning "unless otherwise" indicated.  *Id.* at 500-01 (cleaned up).  The Court therefore held "when Congress established in RICO a civil cause of action for a person 'injured . . . by reason of' a 'conspir[acy],'" Congress "meant to adopt the[] well-established common-law civil conspiracy principles."  *Id.* at 504.  MSP's argument for assignability is not based on applying a common law definition for a word in the RICO statute.  Instead, MSP argue the Court should insert common law principles of assignability into the statute even though nothing in the statute indicates Congress intended such principles to apply.  Indeed, the text of the statute suggests the opposite— only those directly injured can sue.  So, *Beck* does not control.

The Court's conclusion *Silvers* mandates the RICO statute's plain language controls assignability is supported by Judge Berzon's dissent in *Silvers*.  Judge Berzon advocates "the assumption that background common law principles apply with regard to assignment of accrued causes of action" should apply to "the Copyright Act [and] . . . to other federal statutes."  *Silvers*, 402 F.3d at 891 (Berzon, J., dissenting).  She questions "the majority's strict statutory approach," arguing instead "the question of valid assignment 'is appropriate for the development of interstitial

federal common law [to ensure] harmony with the overall purposes of the [Copyright Act].'"  (*Id.* at 891-92 (quoting *Gulfstream III Assocs. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 438 (3d Cir.1993)).  So, Judge Berzon's reading of the majority opinion suggests the majority intended to reject the application of federal common law as to assignment for statutory causes of action, and instead adopt a "strict statutory approach."  Of course, this Court is bound by the *Silvers* majority. *Silvers*, 402 F.3d at 883-890.

In sum, the Court takes Congress at its word—only those injured in business or property can sue under RICO's private right of action.  Because MSP cannot allege such an injury, MSP do not have statutory standing under RICO's private right of action.

### B.     MSP's Cited Cases Are Not Persuasive

MSP also contend "[n]o court has ever held that RICO claims . . . are not transferrable." (Dkt. No. 99 at 21.)  They emphasize the Third Circuit's decision in *Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112 (3d Cir. 1993).  But in *Lerman*, the defendant did not argue, and the Third Circuit did not address, whether RICO is assignable; instead, the defendant argued the assignment was invalid because it was not "express" and RICO assignments cannot be partial.  *Id.* at 112-13; *see also* Reply Brief on Appeal and Answering Brief on Cross-Appeal for Plaintiff-Appellant-Cross-Appellee at 4, *Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106 (3d Cir. 1993) (Nos. 92-5526 & 92-5574), 1993 WL 13015396 at *4 ("As we show below, the absence of an express assignment of Joyce's RICO claim, when coupled with the 'hidden' nature of that claim, poses three insurmountable obstacles to Joyce's 'assignment' argument.  First, a RICO claim is not assigned 'automatically' upon the sale or transfer of corporate assets.  Second, a 'partial' assignment of a RICO claim— wherein the assignor retains the right to pursue damage claims in its own right—is not effective. Third, a RICO claim may not be 'assigned' without knowing abandonment by the directly-injured party.").  And, of course, it is an out-of-circuit case decided well before the Ninth Circuit en banc *Silvers* decision.

The district court cases MSP cite do not persuade this Court that in this Circuit RICO permits an assignee possessing only a bare right to sue to bring a claim under its private right of action.  Many of the cited cases assume the availability of assignment under RICO, without any

analysis as to how or why such assignment exists.  *See MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 3:18-CV-2211-BRM-LHG, 2019 WL 1418129, at *7, *13-*16 (D.N.J. Mar. 29, 2019) (assuming such assignment is permitted under RICO because "[t]he Third Circuit" in *Lerman* "held that the assignment of any claims—including RICO claims—must be 'express' in order to be deemed valid," but then concluding plaintiffs lacked standing under RICO because the indirect purchaser rule barred their claims); *MSP Recovery Claims, Series LLC v. Caring Voice Coal., Inc.*, No. 21-21317-CIV, 2022 WL 3155035, at *4, *6, *10 (S.D. Fla. July 21, 2022) (holding the plaintiffs had constitutional standing to sue the defendants after assuming, without analysis, "[t]he assignee of a claim has standing to assert the injury in fact suffered by the assignor," but concluding plaintiffs "failed to plead adequate antitrust standing," then dismissing the RICO claims because the plaintiffs did "not adequately ple[a]d Defendants' actions proximately caused their injuries" (cleaned up)), *report and recommendation adopted,* No. 1:21-CV-21317, 2022 WL 4448256 (S.D. Fla. Sept. 23, 2022)); *Brown v. Bank of Am., N.A.*, No. ED CV 12-02009 TJH, 2014 WL 12707378, at *1 (C.D. Cal. Feb. 24, 2014) (assuming RICO claims are assignable, citing *Lerman*, 10 F.3d at 112, but holding the plaintiff "lacks standing to assert the RICO claim" because "[a] RICO claim can be assigned only through an express assignment" and the plaintiff "did not attach copies of the assignments" to the complaint), *aff'd*, 660 F. App'x 506, 509 (9th Cir. 2016) (affirming dismissal on standing grounds because the complaint "fails to provide any proof that Brown was assigned claims by the more-than-one-thousand mortgagors he purports to represent"); *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 221, 228 (E.D.N.Y. 1999) (citing other district court cases and concluding "RICO claims are assignable," since other federal courts have found RICO claims assignable), *disapproved of by Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999); *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 400 n.2 (S.D.N.Y. 2013) (citing *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc*, 74 F. Supp 2d. at 228, as evidence "RICO claims are assignable," but then explaining whether the plaintiffs "have standing to bring RICO claims against Defendants need not be resolved here, in light of the Court's dismissal of the RICO claims."); *Nat'l Sec. Couns. v. C.I.A.*, 960 F. Supp. 2d 101, 141

n.15 (D.D.C. 2013) (explaining "[n]umerous . . .  kinds of federal statutory claims have been held to be assignable" and citing *Lerman*, 10 F.3d at 113, to demonstrate courts have held civil RICO claims are assignable); *Mid-Town Surgical Ctr., L.L.P. v. Humana Health Plan of Texas, Inc.*, 16 F. Supp. 3d 767, 774-77 & n.6 (S.D. Tex. 2014) (explaining "the Fifth Circuit has not had occasion to address the assignability of RICO claims," but "numerous federal courts have concluded that a party may obtain derivative standing through assignment to assert the RICO claim of another party" and the defendant "does not appear to contest that the Humana Members can theoretically assign their RICO claims to" the plaintiff, then concluding the plaintiff did not have standing to bring RICO claims because the assignments were "insufficient as a matter of law"); *Zap Cellular, Inc. v. Kurland*, No. 15 CIV. 682 (BMC), 2015 WL 8207315, at *6 (E.D.N.Y. Dec. 6, 2015) (explaining "RICO claims . . . are generally assignable" without any analysis as to why, and then dismissing RICO claims for failure to state a claim); *Fed. Ins. Co. v. Ayers*, 760 F. Supp. 1118, 1120 (E.D. Pa. 1990) (concluding, based on other district court cases, "[a]s long as all the pleading requirements are met, a plaintiff may pursue a RICO claim which it acquired through an assignment"); *Fox Hollow of Turlock Owner's Ass'n v. Mauctrst, LLC*, No. 1:03-CV-5439 AWI SAB, 2017 WL 1207188, at *37 (E.D. Cal. Mar. 31, 2017) (assuming RICO can be assigned because "[f]ederal courts have consistently held that parties may assign RICO claims" (cleaned up)).  None of the cases MSP relies upon analyze the actual language of the RICO statute.  Because the Court holds the statutory language controls, these cases do not alter its conclusion.

### C.   MSP Also Do Not Have Statutory Standing as Strangers to the Underlying Dispute

In her *Silvers* dissent, Judge Berzon advocates for "policy-based analyses in deciding whether assignments of other federal statutory claims [a]re valid," and cautions against "allow[ing] third parties with no relationship to the beneficiary to acquire claims solely for the purpose of litigating them."  *Silvers*, 402 F.3d at 893 (Berzon, J., dissenting) (quoting *Simon v. Value Behav. Health, Inc.*, 208 F.3d 1073, 1081 (9th Cir.), *amended*, 234 F.3d 428 (9th Cir. 2000), *and overruled on other grounds by Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007)).  She

analogized to Ninth Circuit "cases deciding whether to enforce assignments of Employee Retirement Income Security Act ('ERISA') claims, which focus on whether 'the general goal of the statute would be served by prohibiting the type of assignments involved in th[e] case.'" *Id.* at 892 (quoting *Misic v. Bldg. Serv. Employees Health & Welfare Trust*, 789 F.2d 1374, 1377 (9th Cir. 1986) (per curiam)). *Misic* involved a health care provider who was assigned causes of action for health and welfare benefits by his patients. Pre-*Silvers* the Ninth Circuit held such assignments were valid, because while the ERISA statute "prohibits assignment of pension benefits, the statute says nothing about the assignability of health and welfare benefits," and "[n]either the specific purpose of the anti-assignment provision nor the general goal of the statute would be served by prohibiting the type of assignments involved in this case." *Misic*, 789 F.2d at 1377. The court explained "[a]ssignment of trust monies to health care providers results in precisely the benefit the trust is designed to provide and the statute is designed to protect" as the assignments "protect beneficiaries by making it unnecessary for health care providers to evaluate the solvency of patients before commencing medical treatment, and by eliminating the necessity for beneficiaries to pay potentially large medical bills and await compensation from the plan." *Id.*

In contrast, in *Simon*, the Ninth Circuit held the plaintiff "as the assignee of other assignees" did not have standing under ERISA, in part because of the negative policy consequences that would flow from allowing such individuals to sue. *Simon*, 208 F.3d at 1080. Because the plaintiff in *Simon* did not provide medical care to any of the beneficiaries of the benefit claims he held, he was ineligible for *Misic*'s derivative standing. *Id.* at 1081. The *Simon* court declined to extend *Misic*'s holding to include "the assignee of health care providers," reasoning the "derivative standing theory" in *Misic* was "a judicial exception to the rule that only enumerated parties may sue for benefits under Section 502(a)(1)(B)." *Id.* The court explained:

> [W]e granted derivative standing to health care providers *not* because we believed that federal common law on derivative standing trumps the plain language of Section 502. We granted it because permitting health care providers to sue in place of the beneficiaries they had treated was consistent with Congressional intent in enacting ERISA.

*Id.* In comparison, for the court to grant standing to the plaintiff in *Simon*, "would be tantamount to transforming health benefit claims into a freely tradable commodity" and "could lead to endless

1    reassignment of claims," which would not further ERISA's purpose.  *Id.*

2        MSP, like the *Simon* plaintiffs, had and have no relationship with their Assignors.  So, even

3    under the assignability test advocated by Judge Berzon in her *Silvers* dissent, they have no RICO

4    statutory standing.[7]

5        **D.    Antitrust Law Assignment Principles Do Not Dictate RICO Assignment**

6        Finally, MSP's analogies to federal antitrust law also fail to persuade this Court that they

7    have derivative RICO statutory standing.  MSP assert federal courts, including the Ninth Circuit,

8    have held antitrust claims assignable.  *See e.g.*, *Klamath-Lake Pharm. Ass'n v. Klamath Med.*

9    *Serv. Bureau*, 701 F.2d 1276, 1283 (9th Cir. 1983) (assuming antitrust claims can be assigned, and

10   finding the assignment contract transferred all antitrust claims).  Because the RICO private right of

11   action provision was modeled on antitrust law, MSP argue RICO's private right of action should

12   also be assignable.  However, an analysis of antitrust assignability does not persuade the Court to

13   follow such cases despite RICO's plain language.

14       "Congress modeled § 1964(c)"—the RICO private right of action—"on the civil-action

15   provision of the federal antitrust laws, § 4 of the Clayton Act."  *Anza v. Ideal Steel Supply Corp.*,

16   547 U.S. 451, 457 (2006) (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267 (1992)).

17   The civil remedy provision of the Clayton Act provides:

18           [A]ny person who shall be injured in his business or property by
             reason of anything forbidden in the antitrust laws may sue therefor in
19           any district court of the United States in the district in which the
             defendant resides or is found or has an agent, without respect to the
20           amount in controversy, and shall recover threefold the damages by
             him sustained, and the cost of suit, including a reasonable attorney's
21

22   _____

[7] Indeed, MSP, as strangers to the suit, also do not squarely fit within the Third Circuit's holding
23   in *Lerman*, 10 F.3d at 112.  In *Lerman*, the plaintiff purchased "an unincorporated division" that
     "s[old] and distribute[d] office furniture and office supplies."  *Id.* at 108.  Along with the "direct
24   purchase of the entire corporation and all its assets and liabilities," *id.* at 111, the purchase
     agreement provided the plaintiff's purchase included "without limitation, any and all of the
25   following: . . . causes of action, judgments, claims and demands of whatsoever nature."  *Id.*
     Accordingly, the assignee did own the underlying property—unlike MSP here.  Moreover, the
26   court held "the purchase price was inflated because of the racketeering activities, and [the
     plaintiff] specifically paid for the right to assert claims such as this."  *Id.* at 111.  Not so here,
27   when MSP merely purchased the right to sue, untethered to any substantive business or property
     rights.  MSP have not cited to any federal appellate decisions holding an unrelated, disconnected
28   party has statutory standing under RICO when it possesses only a bare assignment.

United States District Court
Northern District of California

fee.

15 U.S.C.A. § 15(a).

Because RICO's private right of action was modeled on the Clayton Act, the Supreme Court has recognized antitrust cases to be a persuasive interpretative tool when analyzing RICO claims. For example, in *Holmes v. Securities Investor Protection Corporation*, the Supreme Court considered whether proximate cause is required for plaintiffs to sue under RICO's private right of action provision, 18 U.S.C. § 1964(c). 503 U.S. at 267. The Supreme Court held because Congress "borrowed" language from the Clayton Act, which was in turn borrowed from the Sherman Act, when it enacted RICO's civil action provision, the Court could "fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4." *Id.* at 268. Before the passage of the Clayton Act, "lower federal courts had read § 7 [of the Sherman Act] to incorporate common-law principles of proximate causation." *Id.* at 267. Because Congress "used the same words" in drafting RICO, the Court could "only assume it intended them to have the same meaning that courts had already given them" and proximate causation was also a required element of RICO claims. *Id.* at 268.

Many federal district courts assume RICO claims are assignable because claims under the Clayton Act are assignable. *See Resol. Tr. Corp. v. S & K Chevrolet*, 868 F. Supp. 1047, 1054 (C.D. Ill. 1994) ("Lower federal courts which have addressed the issue of the assignability of RICO claims have universally found that they are assignable . . . [T]hese courts analogized RICO to the Clayton Act and found that since RICO is closely associated with the Clayton Act and claims under the Clayton Antitrust Act are assignable, claims under RICO should also be assignable." (citations omitted)); *In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 636 F. Supp. 1138, 1155 (C.D. Cal. 1986) (holding RICO treble damages claims are assignable because "there is no reason why the court should not look to analogous antitrust law for guidance in construing RICO's treble damage provisions"); *Fed. Ins. Co. v. Parello*, 767 F. Supp. 157, 163 (N.D. Ill. 1991) ("There is very little room to argue that Congress would intend to allow the assignment of antitrust claims and would prohibit the assignment of RICO claims."); *Nicolls*

*Pointing Coulson, Ltd. v. Transportation Underwriters of Louisiana, Inc.*, 777 F. Supp. 493, 495 (E.D. La. 1991) ("The courts that have explored the issue, and have concluded that RICO claims are assignable, have analogized RICO's treble damages provision to Section 4 of the Clayton Act, which authorizes treble damages for victims of antitrust violations.").

But these cases do not analyze the Clayton Act's actual text.  Instead, much of antitrust assignability jurisprudence stems from the application of federal common law.  At common law, claims that survived a plaintiff's death were generally assignable.  *See Doe v. Cutter Biological, Inc., a Div. of Miles Lab'ys, Inc.*, 1996 WL 344615 at *3 n.5 (9th Cir. 1996) ("[T]he assignability of a cause of action is by authorities intimately associated with, and in most cases held to depend upon, the same principle as the survival of a cause of action." (cleaned up)); *Jim 72 Properties, LLC v. Montgomery Clearners*, 151 F. Supp. 3d 1092, 1097 (C.D. Cal. 2015) ("Whether an action is assignable is often associated with whether the action would survive the death of a party.").  Generally, "actions on penal statutes d[id] not survive" the death of a party, though actions that were remedial in nature did survive.  *Ex parte Schreiber*, 110 U.S. 76, 80 (1884); *see also Rau's Est. v. Comm'r*, 301 F.2d 51, 55 (9th Cir. 1962) (explaining the "well settled rule that at common law, actions on penal statutes do not survive the death of the wrongdoer" (cleaned up)); *Bracken v. Harris & Zide, L.L.P.*, 219 F.R.D. 481, 483 (N.D. Cal. 2004)("[T]he general rule today with respect to the survival of tort actions against decedents' estates is that actions essentially for penalties do not survive for the reason that a decedent is beyond punishment, but that actions to recompense or compensate a plaintiff for a harm inflicted upon him by a decedent do survive, for an estate can, and we think should, compensate for injury to the same extent as the decedent had he lived." (quoting *Derdiarian v. Futterman Corp.*, 223 F. Supp. 265, 269 (S.D.N.Y. 1963)).

The Supreme Court has held the Clayton Act's private right of action is primarily remedial in nature, though it has acknowledged the punitive nature of treble damages.  In *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, the defendant argued "treble damages for antitrust violations" are "punitive," so the defendant should not be held liable for its agents' actions because "under traditional agency law the courts do not employ apparent authority to impose punitive damages upon a principal for the acts of its agents."  456 U.S. 556, 574-75

United States District Court
Northern District of California

1    (1982).  The Court acknowledged "antitrust treble damages were designed in part to punish past

2    violations of the antitrust laws." *Id.* at 575.  But, the Supreme Court held "the antitrust private

3    action" was "primarily [] a remedy for the victims of antitrust violations," because "treble

4    damages" also "serve as a means of deterring antitrust violations and of compensating victims."

5    *Id.* at 575-76.  *See also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977)

6    (holding the private right of action provision of the Clayton Act "is in essence a remedial

7    provision").

8            Following the common law tradition, some courts analyzing antitrust claims after the

9    enactment of the Sherman Act held antitrust claims assignable because of their remedial purpose.

10   For example, in the early case of *Imperial Film Exch. v. Gen. Film Co.*, a district court held the

11   common law indicates an action under the private right of action in the Sherman Act survives the

12   dissolution of a corporation, and therefore can be brought by the receiver of the corporation.  244

13   F. 985 (S.D.N.Y. 1915).  The court began by explaining this "exact point of law . . . has never

14   been decided . . . so far as [the court's] own investigations and those of counsel reveal." *Id.* at

15   986.  The court reasoned since "[t]here is no statute of the United States either preventing or

16   permitting the survival of" a suit under the private right of action in the Sherman Act, "the rules of

17   the common law become applicable." *Id.* at 987.  The court then determined "assignability and

18   the right of survival are attributes of causes of action discoverable by the same tests." *Id.*

19   According to the "general rule . . . [t]he assignability of things in action is now the rule,

20   nonassignability the exception; and this exception is confined to wrong done to the person, the

21   reputation, or the feelings of the injured party, and to contracts of a purely personal nature, like

22   promises of marriage." *Id.* at 988 (quoting *Meech v. Stoner*, 19 N.Y. 26, 29 (1859)).  Because the

23   statutory claim involved "property," the court held it could be assigned, and therefore, "the legal

24   death of the corporation" was "immaterial" and the suit could proceed." *Id.*  Similarly, in *United*

25   *Copper Securities Co. v. Amalgamated Copper Co.*, the Second Circuit concluded since there was

26   "no statutory provision to guide" the court as to the question of assignability of the private right of

27   action under the Sherman Act, the decision was governed by "the common law existing at the time

28   of the Declaration of Independence."  232 F. 574, 577 (2d Cir. 1916).  The court explained

"[t]here can, of course, be no pretense that section 7 of the Sherman Act [the private right of action provision] provides a penalty" because "[i]t awards civil damages, which are made exemplary by virtue of being trebled." *Id.*  Therefore, according to the "common law," private actions under the Sherman Act are "assignable." *Id.* at 578.

This same application of common law principles underpins Ninth Circuit caselaw on antitrust assignability.  In *Hicks v. Bekins Moving & Storage Co.*, the plaintiff brought an action "under section 4 of the Clayton Act . . . to recover three-fold damages for injuries alleged to have been sustained by reason of a combination or conspiracy in violation of the Sherman Anti-Trust Act."  87 F.2d 583, 584 (9th Cir. 1937).  The Ninth Circuit did not analyze the statutory language of the private right of action provision of the Clayton Act.  Instead, it held "[a]n action to recover damages resulting from a violation of the Sherman Anti-Trust Act is not an action to recover a penalty," and therefore "is assignable." *Id*. at 585.

Courts in the decades following the early antitrust assignability cases have mostly followed their lead, *assuming* antitrust claims are assignable based on the earlier caselaw. *See D'Ippolito v. Cities Serv. Co.,* 374 F.2d 643, 647 (2d Cir. 1967) (citing both *United Copper Securities Co.*, 232 F. 574 and *Hicks*, 87 F.2d 583, and holding "[a]ntitrust claims have been held assignable."); *In re Fine Paper Litig. State of Wash.*, 632 F.2d 1081, 1090 (3d Cir. 1980) (holding antitrust claims are assignable because "the status of assignments under the Sherman and Clayton Acts is a matter of federal law, and, in this connection, a number of cases have assumed that such assignments are valid," citing *D'Ippolito*, 374 F.2d at 647 and *Hicks*, 87 F.2d at 585); *Martin v. Morgan Drive Away, Inc.*, 665 F.2d 598, 604 (5th Cir. 1982) ("[T]here is a line of precedent holding that federal antitrust claims are assignable as a matter of federal law.").

But for the reasons previously explained, this reliance on federal common law notwithstanding the statute's specific language conflicts with *Silvers*.  The Court declines to hold MSP have statutory standing merely because some early 20th century Ninth Circuit cases hold antitrust claims assignable and later district court cases assume assignees have derivative RICO statutory standing because of this earlier line of cases or because other cases have held, without analysis, that derivative RICO statutory standing exists.

In sum, while there is a long line of precedent holding antitrust claims assignable, the Court finds such cases unpersuasive given the plain reading of the text of RICO's private right of action.

***

Because the Court holds Plaintiffs lack statutory standing under RICO, the Court DISMISSES (1) Plaintiffs' first cause of action, alleging violations of 18 U.S.C. § 1962(c) through use of the co-payment charity scheme, and (2) Plaintiffs' second cause of action, alleging violations of 18 U.S.C. § 1962(d) through use of the co-payment charity scheme WITHOUT LEAVE TO AMEND.

## CONCLUSION

For the reasons discussed above, the Court DISMISSES all claims against Express Scripts Holding for lack of personal jurisdiction WITH LEAVE TO AMEND as to the alter ego theory of personal jurisdiction.  The Court DISMISSES WITHOUT LEAVE TO AMEND all claims against Express Scripts Holding as to the agency theory of personal jurisdiction or as to the theory RICO's nationwide service provides for personal jurisdiction.

The Court DISMISSES WITHOUT PREJUDICE Plaintiff's claims on behalf of the following Assignors, as Plaintiffs failed to establish Article III standing:

1. Alianza Profesional de Cuidado Medico Inc.
2. Arse, Inc.
3. Administración de Servicios de Atención Primaria, Inc.
4. Broward Primary Partners, LLC
5. Family Physicians of Winter Park, P.A.
6. Grupo Cuidado Geriatrico Integral
7. Health Care Advisor Services, Inc.
8. Risk Watchers, Inc.
9. La Colonia Medical Center, Inc.
10. Med Caribe, C.S.P.
11. Medical Consultants Management, LLC
12. Medical IPA of the Palm Beaches, Inc.
13. Ponce Advance Medical Group, P.S.C.
14. Palm Beach Primary Care Associations, Inc.
15. Premier Care Partners, LLC
16. PDP Health Management, Inc.
17. Physician H.M.O., Inc.
18. Policlinicas Medicas Asociadas, Inc.

19. Primary Physicians Medical Service, LLC
20. Physician Access Urgent Care Group, LLC
21. Quality Care Physicians, LLC
22. Quality Medical Care, Inc.
23. Suncoast Provider Network, Inc.
24. University Health Care MSO, Inc.
25. MCCI Group Holdings, LLC
26. Professional Health Choice
27. WellCloud, LLC A/K/A JustWell Health Partners, Inc.
28. Pura Vida Medical Center, LLC

Further, the Court DISMISSES (1) Plaintiffs' first cause of action, alleging violations of 18

U.S.C. § 1962(c) through use of the co-payment charity scheme, and (2) Plaintiffs' second cause

of action, alleging violations of 18 U.S.C. § 1962(d) through use of the co-payment charity

scheme WITHOUT LEAVE TO AMEND.

While the Court has dispensed with Plaintiffs' RICO claims, Plaintiffs' state law claims for

ten Assignors remain.  The Court ORDERS an additional hearing on July 29, 2024 at 11:00 a.m.

by Zoom video to address the remaining state law claims.  If the parties are unavailable July 29,

they should submit a stipulation requesting a new hearing date and time.  The hearing will occur

virtually and must be scheduled within the next 21 days.

This order disposes of Dkt. No. 97, 108, 118

**IT IS SO ORDERED.**

Dated: July 12, 2024

JACQUELINE SCOTT CORLEY
United States District Judge